**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Randall Lewis CROWDER, Defendant-Appellant.**

**No. 81–5186.**

United States Court of Appeals, Sixth Circuit.

Argued June 20, 1983.

Decided Oct. 13, 1983.

Thomas L. Osborne, argued, Osborne, Deatherage & Fletcher, Paducah, Ky., for defendant-appellant.

Alexander P. Taft, U.S. Atty., Alan E. Sears, argued, Asst. U.S. Atty., Louisville, Ky., for plaintiff-appellee.

Before LIVELY, Chief Judge, EDWARDS, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE, KRUPANSKY, and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

LIVELY, Chief Judge.

A panel of this court reversed Crowder's conviction on two counts of interstate transportation of a motor vehicle, knowing it to have been stolen (18 U.S.C. § 2312), and two counts of receiving, concealing and storing a motor vehicle moving in interstate commerce, knowing it to have been stolen (18 U.S.C. § 2313), 691 F.2d 280. The government filed a petition for rehearing, with a suggestion that the case be reheard *en banc*. Rules 40 and 35, F.R.A.P. This court granted the petition for rehearing and directed that the case be reheard *en banc*. The effect of this action by the court was to vacate the previous opinion and judgment of this court and to restore the case on the docket as a pending appeal. Rule 14, Rules of the Sixth Circuit. The court received supplemental briefs from the parties and heard additional oral argument, after which the case was submitted for decision. We now affirm the judgment of the district court.

## I.

### A.

Two pieces of construction equipment, a dump truck and a front end loader mounted on a trailer, were stolen from a work site in South Holland, Illinois between June 28 and July 1, 1980. The owner testified that the equipment was last seen at the job at about noon on June 28, a Saturday, and was discovered missing at 7:00 a.m. on Tuesday, July 1. The stolen equipment was recovered by a Kentucky State Police Officer,

Darrell Curry, at about 1:30 p.m. on July 1, in a rural area of Muhlenberg County, Kentucky. The truck and trailer were stuck in a ditch. Randall Crowder appeared to be in charge of getting the truck out of the ditch, with another man helping. When approached by Trooper Curry, Crowder said that he was just helping out.

State Police Detective Michael Winn had been summoned by Curry and he arrived at the scene shortly thereafter. The truck and trailer were in the ditch beside a road and the front end loader was off in a field. After inspecting all of the equipment Winn determined that it had been stolen. The detective then advised Crowder of his constitutional rights, and testified as follows concerning Crowder's response:

A Mr. Crowder denied knowing who was in the truck. He told me that he had stopped just to help out the driver of the truck. He denied ever seeing the man before or even knowing his name. I asked if it wasn't true that he had given some people some money for some damage. He told me that he had, that the man driving the truck had given him some money.

Q What else did he say?

A I again questioned him along the line of "you mean the man give you some money when you don't even know his name and he don't know you?" again, the answer "yes".

Q What else did you question him about, and what else did he say?

A At that time he did not say anything else.

Q Did he say what time of day that he first met up with this fellow?

A He advised me that he had first met the man where he had ran off the road into the ditch at a fairly early time in the morning.

After a wrecker arrived the stolen equipment was secured by the police and Crowder was permitted to leave.

Several months later an FBI agent in Hopkinsville, Kentucky, Selden Sledd, called Crowder by telephone and informed him that there was a federal warrant for his arrest in connection with the stolen equipment. Crowder went to the FBI office the next day. The agent advised Crowder of his constitutional rights and Crowder stated that he did not wish to discuss the charges; that he wished to stand by the statement he had made to the state police.

### B.

At Crowder's trial the government presented witnesses who had seen the defendant with the stolen equipment at various places in rural Muhlenberg County on July 1st. These sightings occurred throughout the day, and each time there was some problem with the equipment. A member of a county road maintenance crew, Douglas Mercer, testified in detail about seeing the truck and front end loader, on a trailer, in the area near where it was finally recovered. This occurred at about 9:30 or 10:00 o'clock on the morning of July 1, 1980. This witness said the truck and trailer passed the highway truck which he was driving and then a beige station wagon passed both. The driver of the station wagon flagged the truck down, then stopped and ran back to give the driver of the truck directions, telling him to turn around. A short time later the witness saw the station wagon pulled into a driveway at the bottom of a hill. The truck and trailer with the loader were stalled on the hill and blocked the road so the highway truck could not get by. The driver of the station wagon, identified by the witness as Crowder, got out of his car and was motioning the driver of the truck to back down the hill. The truck and trailer jackknifed and the driver couldn't make them go in any direction. Crowder then gave the witness some money and asked him to get some oil for the truck. The witness said that Crowder pulled the money out of his own pocket and that he did not see the driver give Crowder any money.

Crowder told Mercer that neither he nor the driver of the truck knew how to operate the front end loader (a bulldozer with a scoop or bucket attachment in front). He said they were just responsible for moving

the equipment "down there," that an operator was coming later to run it. Crowder told Mercer that they had come from Chicago and that he lived on the North Side. He said he had brought the truck and trailer down from Chicago that day. The equipment had the name of the Illinois owner stenciled or painted on it. After Mercer and his passengers returned with the oil Crowder ordered the driver out of the truck and tried to move it out of the ditch. Mercer testified that Crowder was giving a lot of directions to the driver of the truck and there was no doubt in his mind that Crowder was in charge. After Mercer had started the front end loader the truck driver tried to drive it off the trailer, but it slipped off and hung up in the ditch. Crowder told the driver to try to use the bucket on the front end loader to dig himself out and to tear down the fence if necessary, that he would replace it. When the driver pulled the fence down, the owner of the land on which the fence stood ran up and demanded to know what was going on. Mercer saw Crowder pull some money out of his pocket and give it to the landowner.

The road was finally cleared when a truck equipped with a winch arrived and its driver used this equipment to pull the truck, trailer and loader out of the way so he could go through. Mercer and his companions then left to replace a mailbox which had been damaged by a highway mower. Upon returning they again came upon the truck, trailer and loader. This time Crowder and the truck driver were having trouble with the truck and trailer brakes.

One of the other crewmen with Mercer testified generally to the same effect as Mercer, and specifically that Crowder was giving the truck driver directions and that he saw Crowder give money to the landowner whose fence was damaged.

The landowner, Marvin Whittaker, identified Crowder as one of the people who had problems with a truck and front end loader getting stuck in a ditch near his property. He testified that Crowder gave him money to pay for tearing down a fence and post and that Crowder told him he was deliver-

ing the equipment to the operator. After the loader was pulled from the ditch this witness saw Crowder leave driving the truck while the truck driver left in the station wagon.

The driver of the pickup truck with a winch who finally cleared the road testified that when he came upon the scene near the Whittaker farm the trailer was across the road, with the truck in the ditch on one side of the road and the loader in the opposite ditch. The county truck was stopped on the road, blocked by the equipment. After this witness had pulled the trailer out of the road Crowder offered him $20 to pull the truck out of the ditch. This occurred about 10 a.m. on July 1st. When this witness returned about 3:30 or 4:00 o'clock that afternoon he was stopped by a state policeman who pointed out the front end loader parked off the road about 200 feet in a woods, where it could barely be seen. Crowder was standing nearby.

Another motorist whose passage was blocked by the trailer testified that after the equipment was removed from the ditch the truck driver ran into the witness' truck before pulling away with the trailer attached to the dump truck. When the witness protested to Crowder about his truck having been hit, Crowder said "it was a pretty reliable company" and would probably take care of any damages. A short time later this witness saw the loader sitting in the road near the Whittaker property. After calling the sheriff's office to report that his truck had been hit the witness returned to the place where he had last seen the loader, but it was gone. Following the fresh tracks on the pavement he found the loader parked in a thicket off a gravel road. Later he came upon Crowder with the dump truck and trailer, again stalled on the hill.

After Trooper Curry and Detective Winn had testified concerning their investigation and conversations with Crowder the government called FBI agent Sledd who testified over defense objections that Crowder told him he did not want to discuss the charges, but wished to stand by the state-

ment he had made to the state police. Defense counsel moved for a mistrial, but his motion was denied.

### C.

Crowder elected to testify in his own behalf. His version of the events of July 1, 1980 was that at about 8:00 o'clock in the morning he was on his way to measure some dry wall which he had installed, for the purpose of making out a bill, when he came upon the dump truck, trailer and loader jackknifed in the road. Crowder testified that he stopped and offered to help and then recited the various problems encountered. He insisted that he had never seen the driver of the dump truck before that time. He said when the fence was damaged and Whittaker approached them the driver gave him $40 and told him to pay the man for his fence. He also said the money he gave Mercer to buy oil was from the $40 which the driver had given him, as was the $20 he gave the motorist to pull the equipment out with his winch. He stated that he saw the driver of the dump truck walk into the woods just before the police arrived and that he had not seen him since that time.

Crowder testified that he lived in Kentucky and had not been in Illinois on July 1st or any time during the preceding weekend. He denied telling Mercer that he lived in Chicago or that he had brought the equipment to Kentucky from Chicago. On cross-examination Crowder said he had left home at 7:30 or 8:00 o'clock on the morning of July 1st and specifically denied being in the community of Gus earlier that day. A rebuttal witness testified that he saw the truck and trailer with a loader on it about 7:00 o'clock on the morning of July 1st. It was traveling toward Gus and a small light-colored station wagon with a spare tire on top was following. Crowder's beige station wagon had a spare tire strapped to the top on July 1st.

Crowder also testified on cross-examination that he had told FBI Agent Sledd that he did not want to discuss the matter and would stand by his previous statements to the Kentucky State Police. The district court immediately charged the jury, *sua sponte,* "He had the perfect right to make that statement, Ladies and Gentlemen, and that it is not to be considered evidence of his guilt."

### II.

Crowder contends that the district court committed constitutional error in permitting testimony that he told the FBI agent he did not desire to discuss the matter for which he was arrested and that he chose to stand by his statement to the state police. He relies principally upon *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), arguing that the government was prohibited from introducing testimony that he remained silent after having been advised of his right to do so. The problem with this argument is that Crowder never exercised his Fifth Amendment right to remain silent as he was advised he had a right to do. When first questioned by Detective Winn the defendant offered a full exculpatory explanation of his activities. When questioned later by Agent Sledd, while he said he did not want to discuss the matter, he specifically referred the agent to his previous statement to Winn and said he wished to stand by that statement. This was not a claim of the right not to speak, but a reiteration of his previous story.

The question in *Doyle v. Ohio,* as stated by Justice Powell writing for the Court, was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, *told for the first time at trial,* by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." 426 U.S. at 611, 96 S.Ct. at 2241 (emphasis added) (footnote omitted). The due process violation identified in *Doyle* is that of unfairly suggesting to a jury that a person who has elected to remain silent at arrest after being told he had the right to do so must be telling the jury a recently fabricated story when he offers an exculpatory explanation for his activities at trial. Since it is implicit in the *Miranda* recitation of rights that "silence will carry no penalty,"

silence thus induced may not be used "to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. at 2245 (footnote omitted).

In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court made it clear that there is no *Doyle* violation when a defendant is cross-examined about silence where no *Miranda* warnings have been given. There the defendant was asked why he had told no one his self-defense version of a homicide in the time between the killing and an interview with a police officer some days later. Inquiry into pre-arrest silence is permitted, because no governmental action has induced the defendant to remain silent. *Id.* at 240, 100 S.Ct. at 2130. This emphasis on the importance of the *Miranda* warnings to the *Doyle* rationale was repeated in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam). There the record did not reflect that *Miranda* warnings were given in the period of silence immediately following arrest. The defendant offered an exculpatory story for the first time while testifying on his own behalf and the prosecutor was allowed to cross-examine as to why the defendant had failed to advance his exculpatory explanation when arrested. In reversing this court's judgment granting a writ of habeas corpus the Supreme Court wrote:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

*Id.* at 607, 102 S.Ct. at 1312.

The defendant in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam), told the police, when arrested and after receiving *Miranda* warnings, that he had stolen a car connected with a homicide at a particular location in Ann Arbor, Michigan. At his trial the defendant testified on direct examination that he had stolen the car from a different location. On cross-examination the prosecutor asked the defendant if this was a recent fabrication. After this court directed the district court to grant the defendant a writ of habeas corpus the Supreme Court reversed, holding that "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408, 100 S.Ct. at 2182. Cross-examination about prior inconsistent statements was found not to have been designed to draw meaning from silence.

The facts of this case are not exactly like those of *Doyle* or any of its progeny. Here Crowder did not tell his version of the July 1st events for the first time while testifying at trial, as was the case in *Doyle* and *Fletcher.* Nor was there a period of pre-arrest silence followed by a post-arrest explanation of events which led to criminal charges as in *Jenkins.* And the questions asked at trial did not seek to impeach the defendant by revealing a prior inconsistent statement as in *Anderson v. Charles.* However, as in *Anderson v. Charles,* there was no silence. From the time of Crowder's first encounter with the state police on July 1, 1980, he maintained that his only connection with the stolen equipment was that of a traveler lending assistance to a stranger having difficulties on the road—a Good Samaritan. He offered that explanation when it became clear that Detective Winn was suspicious of his activities and had advised him of his constitutional rights. When Agent Sledd presented the federal complaint Crowder said, in effect, "I have told my story to the Kentucky State Police and I am sticking to it." There was never any claim of the Fifth Amendment privilege to remain silent. This case is controlled by *Anderson v. Charles* because "the defendant has not remained silent at all." 447 U.S. at 408, 100 S.Ct. at 2182.

The defendant contends that *Anderson v. Charles* does not control this case because he never made a prior statement which was inconsistent with his trial testimony. This argument relies on a reading of *Anderson v. Charles* which is too restrictive. While there was a prior inconsistent statement in that case, it merely furnished the occasion for questioning the defendant. There is no indication that the Court limited its holding to situations involving prior inconsistent statements. What *Anderson v. Charles* teaches is that the *Doyle* rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings. Here there was no silence and the prosecutor never implied that Crowder's testimony was recently fabricated. He just brought to the jury's attention that Crowder continued throughout to stick with a story which was contradicted in many details by the testimony of disinterested witnesses. This is not a *Doyle* case as that decision has been interpreted and limited by subsequent Supreme Court decisions. *See Goudlock v. Marshall,* 712 F.2d 238 (6th Cir., 1983).

### III.

Crowder makes an additional argument for reversal on the basis of the district court's instructions to the jury. The following language was included in the jury charge:

> The jury keeps in mind, of course, that in the eyes of the law, a man is held to intend the natural consequences which flow from his own acts, though of course, the burden always remains with the government to prove every essential element of each count charged in the indictment beyond a reasonable doubt to your satisfaction. The law never imposes upon a defendant the burden or duty of calling any witness or producing any evidence.

The defendant did not object to this instruction, though he made detailed objections to other parts of the jury charge.

■ In *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a similar charge violated the due process rights of a criminal defendant. The Court reasoned that no presumption, whether conclusive or rebuttable, which has the effect of shifting the burden of persuasion to the defendant may exist in a criminal case. Any instruction which the jury may interpret as advising that a burden-shifting presumption exists is erroneous.

■ Instructions similar to the one given in the present case had been criticized by this court prior to the *Sandstrom* decision. *See, e.g. United States v. Reeves,* 594 F.2d 536 (6th Cir.1979); *United States v. Gaines,* 594 F.2d 541 (6th Cir.1979); *United States v. Cooper,* 577 F.2d 1079 (6th Cir.1978); *United States v. Denton,* 336 F.2d 785 (6th Cir.1964). Following *Sandstrom* this court held that giving an instruction identical to the one given in this case constitutes plain error. *United States v. Williams,* 665 F.2d 107 (6th Cir.1981). When intent is an element of an offense it is constitutional error to charge a jury that this element may be supplied by a presumption rather than requiring the prosecution to prove it by evidence, direct or circumstantial.

The Court did not consider harmless error in *Sandstrom* because that issue had not been considered by the Montana Supreme Court. The Supreme Court addressed the question of whether a *Sandstrom* error could be harmless in *Connecticut v. Johnson,* —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), but reached no conclusion. The Court split 4 to 4 on the issue with Justice Stevens stating that he would have dismissed the writ of certiorari since the Connecticut Supreme Court had refused to hold the error harmless. In *Williams* this court found that the giving of the instruction was not harmless error, though it was considered a close question.

■ A constitutional error may be held harmless only if it is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We entertain no doubt that the jury would have reached the same verdict

in this case if the offending "boilerplate" instruction had not been given. The only *acts* of Crowder which were the subject of testimony related to his efforts to remove the equipment from the ditches, including giving orders to the driver and paying others to assist. The natural consequences of these acts would be to get the equipment back on the highway and moving toward its destination. Recognition of these consequences did not in any way affect the government's burden of proof; they were consistent with Crowder's story. The government was required to prove the defendant's wrongful transportation and possession of the equipment totally aside from any presumed consequences of his acts. These elements were proved by evidence of Crowder's conflicting stories to disinterested witnesses and by inferences drawn from all the proof, not by any presumption that he intended the natural consequences of his acts.

In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Court found harmless error where evidence of guilt was overwhelming. The evidence was overwhelming that Crowder had an interest in the stolen equipment which went far beyond merely helping another traveler in distress. Every important feature of his testimony was contradicted by testimony of disinterested witnesses. The jury heard evidence that before the police arrived Crowder told several people that he was responsible for bringing the equipment to Kentucky for delivery to an operator, and stated to at least one witness that he had brought the equipment from Illinois himself. These disinterested witnesses testified that Crowder was giving instructions to the driver of the dump truck and appeared to be in charge. He paid for help in moving the ditched equipment and for motor oil and fence repairs with money from his pocket. It was only after the police showed an interest in the equipment that Crowder disclaimed any knowledge of its origin or the identity of the driver. Further, though he said he left home early in the morning to make some measurements on work in another community Crowder spent the entire day working with the "stranger." At one time in the morning the equipment had been moved back on the highway and the "Good Samaritan" work was finished. However, he did not leave, but remained in the area and was involved in trying to move it after a second breakdown. Finally, a rebuttal witness positively identified the "caravan" of Crowder's distinctive station wagon with a tire on top, the dump truck and trailer hauling the loader on a different road at about 7 o'clock on the morning of July 1st. This flatly contradicted Crowder's testimony that he had not left home until 7:30 or 8:00 o'clock and had never seen the stolen equipment prior to coming upon it at the place where it first jackknifed. In light of all the evidence we do not believe that the erroneous instruction, which had little or no application to any contested issue in the case,[1] contributed to the jury verdict.

The judgment of the district court is affirmed.

CONTIE, Circuit Judge, concurring in part and dissenting in part.

The majority opinion concludes that because the defendant Crowder made an ex-

---

1. In its *mens rea* argument the dissent addresses an issue which was not raised in the trial court or in this court. In doing so it displays confusion between permissible inferences and impermissible presumptions. Crowder made no objection to the district court's instruction:

   Possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which a jury may reasonably draw the inference and find, in the light of surrounding circumstances shown by the evidence in the case, that the person in possession knew the property had been stolen.

Objection would have been futile because this court has specifically approved this instruction. See *United States v. Jennewein*, 590 F.2d 191 (6th Cir.1978); *United States v. Brady*, 595 F.2d 359, 363 n. 3 (6th Cir.1979). This instruction may have provided the jury with a basis for inferring that Crowder knew the equipment was stolen. If so, the inference was a permitted one. The *Sandstrom* instruction did not deal with Crowder's knowledge that the equipment was stolen. There is nothing in that instruction which addresses the question of his knowledge.

culpatory statement rather than remaining silent after having been given *Miranda* warnings, this case is controlled by the Supreme Court's decision in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), rather than by the Court's holding in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Since I am of the opinion that Crowder did nothing more than to invoke his constitutional right to remain silent and since I further believe that the government's sole purpose in inquiring about the defendant's post-warning conduct was to imply guilt from his silence, I must dissent in part. I agree with the majority that the *Sandstrom* instruction was harmless error because the instruction only created a presumption that the defendant intended to help the truck driver return the truck and trailer to the highway so that the driver could proceed. Crowder himself testified that such was his intent. Thus, the instruction in question could not have been used by the jury to supply an intent to transport stolen vehicles across state lines and to receive, conceal and store those vehicles. I do not agree, however, that the instruction was harmless error because of overwhelming evidence.

As indicated by the majority, Crowder told an exculpatory story to Detective Winn at the scene where the stolen vehicles were recovered. Although the admissibility of this statement is beyond dispute, such is not the case concerning Crowder's response to questioning after he had surrendered himself and been advised of his constitutional rights. The record reflects that after Agent Sledd informed the defendant of the outstanding arrest warrant, the latter consulted an attorney before going to FBI headquarters. The attorney counseled Crowder not to discuss the case. When asked by Agent Sledd the next day whether he wished to talk about the charges, Crowder responded that he did not wish to discuss the matter and that he would stand by the statement previously made to the state police. The government introduced this remark through the testimony of Agent Sledd during its case-in-chief and questioned

Crowder about the response on cross-examination.

Although a waiver of *Miranda* rights may be inferred from a defendant's words and actions, the burden of proof rests upon the government. Waiver of constitutional rights is not to be presumed. *Tague v. Louisiana,* 444 U.S. 469, 471, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980); *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1759, 60 L.Ed.2d 286 (1979). In the present case, a waiver would consist of a voluntary, knowing and intelligent relinquishment or abandonment of the constitutional right to remain silent. *See Tague,* 444 U.S. at 470, 100 S.Ct. at 653; *Butler,* 441 U.S. at 373, 99 S.Ct. at 1757; *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). In determining whether a waiver has occurred, a court must examine "the background, experience and conduct of the accused." *Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1758; *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Under these standards, Crowder did not waive the right to remain silent.

The record does not indicate that Crowder possessed any legal training or significant experience with the criminal justice system when the events in question transpired. When notified of his impending arrest, the defendant sought legal counsel, who advised him not to discuss the case. Under these circumstances, the most reasonable inference is that Crowder's response to Sledd's question was merely an attempt to follow his attorney's instruction to remain silent and was not a knowing and intelligent waiver of that right. Furthermore, any doubt about the matter should be resolved against the government.

The defendant in *Anderson v. Charles* said much more than Crowder said here. When questioned about a stolen automobile which had belonged to a murder victim, Charles gave a detailed account about the place from which he had taken the auto. That location was not near the murder scene. In contrast, Crowder in effect indicated that he would say no more than he had already said. He made absolutely no

attempt to relate the specifics of a favorable version of what had occurred on July 1, 1980. Although persons skilled in the criminal law might not have used the verbal formulation used by Crowder in order to assert Fifth Amendment rights, the defendant's response to Sledd's question was a layman's way of achieving the same result. Since Crowder did not relate the details or substance of an exculpatory story to agent Sledd, neither his words nor his conduct demonstrates a voluntary, knowing and intelligent waiver of the right to remain silent. Crowder made no statement and his silence should not have been introduced during the government's case-in-chief or during cross-examination.

Secondly, and as noted by Judge Peck in his dissenting opinion, the government was able to introduce the substance of the defendant's exculpatory story through the testimony of Detective Winn, who had questioned Crowder at the recovery scene. The defendant's later response to Agent Sledd's question no more than mentioned the prior statement and was not inconsistent with that statement. Unlike the situation in *Anderson v. Charles,* the defendant's response was useless for impeachment purposes. Consequently, the government's purpose in introducing the response must have been to place before the jury the defendant's election to remain silent. Implying that a defendant is guilty because he declined to talk to law enforcement officials after having been given *Miranda* warnings is precisely the tactic that *Doyle v. Ohio* found to be fundamentally unfair.

Accordingly, I would reverse the judgment of the district court and grant the writ.

JOHN W. PECK, Senior Circuit Judge, dissenting with whom Keith and Jones, Circuit Judges, joined.

Because I believe that the majority errs both in its interpretation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and its progeny, and in its analysis of the jury instruction given in contravention of the dictates of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), as harmless error, I respectfully dissent.

The majority states that "[t]his [case] is not a *Doyle* case as that decision has been interpreted and limited by subsequent Supreme Court decisions." Majority op. at 172 (citation omitted). Rather, the majority construes the evidence as showing that unlike the defendants in *Doyle,* Crowder did not exercise his right to remain silent but instead reiterated the story he had given several months before to the Kentucky State Police. I do not agree.

Crowder's purported "statement" was first presented to the jury in the testimony of FBI agent Seldon Sledd in the prosecution's case-in-chief:

Q. Did he state that he understood the constitutional rights?

A. Yes he did.

MR. OSBORNE. May we approach the bench.

BY THE COURT: Yes.

(At bench out of the hearing of the jury.)

MR. OSBORNE. I don't believe this trick.

MR. GILLENWATER. This what?

MR. OSBORNE. This trick—t-r-i-c-k. This man took the fifth and declined to give a statement.

BY THE COURT. What are you objecting to?

MR. OSBORNE. He advised the man of his constitutional rights and he was not willing to give a statement. He said he didn't want to, and he didn't have to.

BY THE COURT: Mr. Witness.

(Witness at bench out of hearing of the jury.)

BY THE COURT. *Did the defendant make a statement to you after you advised him of his rights?*

THE WITNESS. *No, sir. He said he didn't want to and he didn't have to.*

MR. GILLENWATER. Could I refresh his memory? He said that he would stand by the statement he made to the police.

MR. GILLENWATER. That is his statement.

BY THE COURT. All right. I will let him answer about that.

MR. OSBORNE. Your honor, to allow into evidence the admission of an accused person to refuse a statement after he has been advised of his rights is in violence, in my opinion, of the fifth amendment to the United States Constitution, and I move for a mistrial.

BY THE COURT. Well, if he had refused, this evidence wouldn't have been competent, but he didn't. He said he would stand by his statement to the police.

*Continuing Direct Examination*

Q. Did he indicate to you—What did he say to you?

A. After being advised of his rights, he stated that he did not wish to discuss these charges, that he wished to stand by the statement he had made to the State Police.

Trans. 317–19 (emphasis added).

Crowder's "statement" was again presented to the jury during the prosecution's cross-examination of Crowder.

Q. Do you recall being interviewed by Agent Sledd on December 9, 1980?

A. Yes, I do.

Q. Well, did you make this statement to him? "I do not wish to discuss the matter and will stand by my previous statements to the Kentucky State Police"?

A. Yes, I did.

BY THE COURT: He had the perfect right to make that statement, ladies and gentlemen, and that is not to be considered as evidence of his guilt.

A. I made that statement, If I may say so, on the advice of a previous lawyer that I had had.

Q. Your lawyer told you to make that statement?

A. That is correct.

BY THE COURT: He didn't have to make any statement.

A. (Continuing) Not this lawyer.

Trans. 429.

I believe that a fair reading of this testimony reveals that Crowder invoked his right to silence as explicated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and leads to the conclusion that this case is controlled by *Doyle.* Crowder made his statement to Agent Sledd invoking his right to silence following the reading of his *Miranda* rights and on the advice of counsel. As the Supreme Court stated in *Doyle:*

> "[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony...."

426 U.S. at 619, 96 S.Ct. at 2245, (quoting *United States v. Hale,* 422 U.S. 171, 182–83, 95 S.Ct. 2133, 2139–2140, 45 L.Ed.2d 99 (1975) (White, J., concurring)). Moreover, this case is factually indistinguishable from *Doyle.* In *Doyle,* after the two defendants were arrested and informed of their *Miranda* rights, one said nothing. The other defendant, Jefferson Doyle, asked arresting officers "[W]hat's this all about?" *Doyle v. Ohio, supra,* 426 U.S. at 615 n. 5, 96 S.Ct. at 2243 n. 5. After the officers informed him of the reason for his arrest, he said "you got to be crazy" or "I don't know what you are talking about." *Id.* at 622 n. 4, 96 S.Ct. at 2247 (Stevens, J., dissenting). Neither the majority nor the dissent in *Doyle* treated these comments as waivers of Doyle's right to remain silent. *Id.* at 616–20, 96 S.Ct. at 2244–2246; *id.* at 620, 621, 622, 626, 96 S.Ct. at 2246, 2248 (Stevens, J., dissenting). *See Anderson v. Charles,* 447 U.S. 404, 407, 100 S.Ct. 2180, 2181, 65 L.Ed.2d 222 (1980) (per curiam) (discussing the factual background

of *Doyle*). I simply cannot conclude, as the majority must, that the statement "I do not wish to discuss the matter and will stand by my previous statements to the Kentucky State Police" is a waiver of the right to silence, but that statements such as "you got to be crazy" and "I don't know what you are talking about" are not.

The decisions cited by the majority as limiting *Doyle,* do not compel the decision reached today. Neither *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), nor *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), is apposite because Crowder received the *Miranda* warnings which trigger the applicability of *Doyle* and were absent in those cases. *Anderson v. Charles, supra,* is not, contrary to the claim of the majority, controlling. In *Charles,* the Supreme Court held that where inconsistent statements have been made by a defendant, the omission of facts from one statement that are contained in the other statement is not silence within the meaning of *Doyle.* 447 U.S. at 409, 100 S.Ct. at 2182. The Court in *Charles* explicitly distinguished *Doyle* on the ground that in *Doyle* neither defendant made any statement contradicting his subsequent trial testimony. *Id.* at 407 n. 2 & 408, 100 S.Ct. at 2182 n. 2. As the majority concedes, Crowder made no statement inconsistent with his subsequent trial testimony.

There is one point which distinguishes *Doyle* from the instant case, but the distinction further supports vacating the judgment of the district court. *Doyle* involved a prosecutor's emphasizing a defendant's silence for the purpose of impeaching the defendant's subsequent trial testimony. In the instant case, the prosecution first introduced evidence of Crowder's invoking his right to counsel in its case-in-chief. The majority contends that the prosecutor by introducing the evidence "just brought to the jury's attention that Crowder continued throughout to stick with a story which was contradicted in many details by the testimony of disinterested witnesses." Majority op. at 172. Because there was no suggestion that Crowder ever wavered in adhering

to his statement that his sole tie to the stolen equipment was as a good samaritan, the only possible reason for the prosecutor's improper question was his desire to benefit from the incriminating implications of Crowder's invoking his *Miranda* right to silence. Accordingly, I would vacate the judgment of the district court.

Although the original panel did not reach the question because of its disposition of the *Doyle* issue, I believe that the jury instruction given in violation of *Sandstrom* also requires vacating the judgment of the district court. I concur in the majority's conclusions that the instructions do violate *Sandstrom* and that they are plain error. I do not, however, concur in the majority's conclusion that the error was harmless.

As the majority acknowledges, the Supreme Court divided equally on the question of whether a *Sandstrom* error can be harmless. *Connecticut v. Johnson,* —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). Because neither the plurality nor the dissenting opinion is a binding holding of the Court, I would follow the approach adopted by various panels of this court that whether a *Sandstrom* error is harmless is in large measure a function of the defense asserted at trial. *Engle v. Koehler,* 707 F.2d 241, 246 (6th Cir.1983); *Conway v. Anderson,* 698 F.2d 282, 285 (6th Cir.1983). Judge Contie, writing for the panel in *Koehler,* delineated the approach quite well:

> If the defendant acknowledges that an intentional, malicious killing occurred and only claims non-participation, then a *Sandstrom* instruction may be harmless. Conversely, if the defendant asserts lack of *mens rea,* a *Sandstrom* instruction can be extremely prejudicial even if overall proof of intent or malice is substantial.

707 F.2d at 246 (citation omitted).

Crowder both denied participation in the transportation and receiving of stolen equipment and asserted lack of *mens rea.* Specifically, Crowder denied that he knew that the vehicles were stolen and argued that the government had failed to prove beyond a reasonable doubt that he had such

knowledge. Not only was Crowder's mental state placed squarely into issue by the defense, but the government argued, and the trial court instructed, that Crowder's knowledge that the equipment was stolen could be inferred from his failure to explain or his unsatisfactory explanation of his possession of the equipment. In such circumstances, I would not, as the majority does, apply woodenly an "overwhelming evidence" standard as a touchstone for determining the harmlessness of a *Sandstrom* error. I would not, as the majority does, find the *Sandstrom* error in the instant case to be harmless because the overall proof of guilt is substantial.

Even if I were to apply an "overwhelming evidence" standard in this case, I would dissent from the majority's holding that the *Sandstrom* error was harmless. While the evidence was sufficient to sustain Crowder's conviction, sufficiency of the evidence is not dispositive of the issue of harmless error. *Williams v. Engle,* 683 F.2d 152, 153 (6th Cir.1982) (per curiam). I do not find the proof of guilt overwhelming.

As the majority states, Crowder's testimony was contradicted by the testimony of disinterested witnesses on various points. The majority ignores, however, that on many of those points Crowder's testimony was corroborated by the testimony of other witnesses. Due to the conflicting testimony and the fact that proof of most of the ultimate issues of fact relies heavily on jury inferences, I cannot concur in the majority's finding that the proof of guilt was so overwhelming in this case that the *Sandstrom* error was harmless. *See Williams, supra.*

For the above reasons, I respectfully dissent.