914 F.2d 255
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Danny CARPENTER, Petitioner-Appellant,
v.
Terry L. MORRIS, Supt., Respondent-Appellee.
 No. 89-3575.
 United States Court of Appeals, Sixth Circuit.
 Aug. 31, 1990.
 
 Before KENNEDY, BOGGS and SUHRHEINRICH, Circuit Judges.
 PER CURIAM:
 
 
 1
 Petitioner, Danny Carpenter, was indicted by the Cuyahoga County Ohio grand jury on October 10, 1984. He was charged with one count of aggravated murder, three counts of aggravated robbery, and seven counts of felonious assault. Following a jury trial, Carpenter was found guilty of the lesser included offense of murder on the aggravated murder count, guilty on the three counts of aggravated robbery, and guilty on six of the seven felonious assault counts. The jury also found petitioner guilty of firearm specifications on each of the counts.
 
 
 2
 While represented by court-appointed counsel, petitioner appealed his conviction to the Ohio Court of Appeals for the Eighth Appellate District in which he raised three assignments of error. Petitioner, through appointed counsel, filed his appellant's brief on April 26, 1985. The State of Ohio filed its brief on May 16, 1985. On June 14, 1985, petitioner retained counsel who filed a motion for leave to file supplemental assignments of error and a new appellant's brief containing ten new assignments of error. On July 11, 1985, the court of appeals denied his motion for leave. On July 15, 1985, petitioner filed a motion for substitution of counsel on appeal. This motion was granted on August 5, 1985, allowing petitioner's retained counsel to participate in oral arguments.
 
 
 3
 The court of appeals upheld petitioner's conviction. Petitioner then sought review in the Ohio Supreme Court raising the three claims asserted in his appellate brief, the ten issues raised in his supplemental brief, and the additional claim of denial of counsel of his choice on appeal. The Ohio Supreme Court denied review of the case. Petitioner then initiated an action for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2554 in the United States District Court for the Northern District of Ohio. He raised the same fourteen bases for relief that were presented to the Ohio Supreme Court.
 
 
 4
 The District Court referred the matter to a magistrate for a report and recommended decision. The magistrate initially returned a report and recommended decision dismissing the petition for failure to exhaust state remedies. The District Court found that petitioner had exhausted his state remedies and re-referred the matter to the magistrate for consideration of petitioner's claims. The magistrate then filed a Report and Recommended Decision dismissing the petition; this Report was incorporated by the District Court in its decision dismissing the petition. The District Court first found that petitioner's objection to the magistrate's reliance upon the findings of fact of the Ohio court of appeals was without merit because none of petitioner's claims before the District Court raised an issue of fact. The District Court then found meritless petitioner's argument that the magistrate should have recommended that a writ of habeas corpus be issued unless the Ohio court of appeals reinstates his appeal and considers the merits of the claims asserted in petitioner's retained counsel's supplemental brief. The District Court stated that in its Memorandum of Opinion and Order of Re-Reference, the court had found that those claims "were presented to, and rejected by, the state court of appeals." With respect to petitioner's claim that he was entitled to an instruction on the lesser included offense of involuntary manslaughter, the District Court found that the evidence presented in petitioner's case did not warrant an instruction on the lesser included offense. The District Court found petitioner's remaining claims for habeas relief to be meritless.
 
 
 5
 Before this Court, petitioner raises twelve issues. He appeals the District Court's findings that he was not denied appellate counsel of choice and that his three claims presented to the Ohio court of appeals were without merit. Petitioner also raises many of the claims originally asserted in his retained counsel's supplemental brief. We AFFIRM the judgment of the District Court.
 
 I.
 
 6
 Petitioner first argues that the Ohio appellate court's refusal to allow his retained counsel to file a supplemental brief denied him counsel of his choice on appeal. Petitioner contends that the Supreme Court case of Penson v. Ohio, 488 U.S. 75 (1988) supports his argument. Penson involved an indigent defendant who was convicted and thereafter appealed to an Ohio court of appeals through appointed counsel. Prior to filing a brief, defendant's appointed counsel filed a motion for leave to withdraw, supported only by a statement that he had reviewed the record and found no issues worthy of presentation on appeal. The court granted appointed counsel's motion to withdraw. Counsel failed to identify parts of the record which might give rise to an appealable issue, and the court failed to conduct an independent analysis of the case to determine whether any arguable issues existed. Thus the Court found that Anders v. California, 386 U.S. 738 (1967) was not complied with and accordingly reversed and remanded the case. The Court also concluded that the lack of prejudice standard of Strickland v. Washington, 466 U.S. 668 (1984) and the harmless error analysis of Chapman v. California, 386 U.S. 18 (1967) are not applicable to Anders violations.
 
 
 7
 We fail to see how Penson buttresses petitioner's argument that he was denied counsel on appeal. Unlike the defendant in Penson, petitioner in the present case was represented at all stages by counsel. Petitioner did not attempt to change attorneys until after the briefing was completed. This request was granted, and the court of appeals invited new counsel to join in the next step of the proceedings, the oral argument. Thus petitioner was not denied the counsel of his choice on appeal.
 
 
 8
 The Supreme Court, in United States v. Cronic, 466 U.S. 648, 656 (1984), stated that "[t]he right to the effective assistance of counsel is ... the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." Id. at 656. Petitioner in the present case was not denied a "true adversarial criminal trial." Id. Thus he cannot make out an ineffective assistance of counsel claim.
 
 II.
 
 9
 Respondent argues that petitioner has waived all of his remaining claims, with the exception of those three claims properly presented to the Ohio court of appeals. The District Court, in its Memorandum of Opinion and Order of Re-Reference, found that "the issue of whether the court of appeals properly refused petitioner leave to file his supplemental assignments of error is res judicata and may not be raised in an Ohio post-conviction proceeding under Ohio Rev.Code Ann. Sec. 2953.21(A)." The court further found that "in addition to the three original assignments of error, the ten supplemental assignments of error were presented to, and rejected by, the state court of appeals. Therefore, all thirteen of petitioner's assignments of error are properly before this Court and their merits must be addressed." The magistrate considered the arguments and found each to be meritless; his findings were adopted by the District Court. We agree with the magistrate and the District Court that each of these arguments lacks merit.
 
 III.
 A.
 
 10
 Petitioner makes three additional arguments; we consider each in turn. First, he argues that the District Court erred in finding that his due process rights were not violated by the prosecution's reference at trial to petitioner's post-arrest silence.
 
 
 11
 On direct examination, petitioner testified that he had wanted to make a statement after he arrived at the police station:
 
 
 12
 And so they turn me over, and put the handcuffs on me, and pick me up by the handcuffs and push me like, you know, call me a name, all kind of names, but they told me to just go on towards the cop car. And I almost fell, so I went to the cop car. And I sit down, and I told them I wanted to talk to them after I got downtown, because I really started getting scared. So after we got downtown the one cop, I think, it was Taliaferro, he was laughing at us, and "Ha, ha, you are getting the chair," and stuff like that, and constantly joking about everything.
 
 
 13
 So when I talked to him for a minute, and I can't recall what I was saying to him. So they started doing me--Taliaferro and his partner, they started like, you know, "get out of here, we don't want to hear that." So they put me back in the cell. And then we had a few lineups.
 
 
 14
 Q. Were you trying to tell them what happened at the scene?
 
 
 15
 MR. MAROLT: Objection, your Honor.
 
 
 16
 Q. Well, with regard to what you said?
 
 
 17
 THE COURT: Overruled.
 
 
 18
 A. Yes.
 
 
 19
 Joint App. at 439.
 
 
 20
 On cross-examination, the prosecutor attempted to clarify petitioner's prior assertion:
 
 
 21
 Q. Are you telling me and this jury then, that Detective Taliaferro did not want to listen to what you were going to say about this?
 
 
 22
 A. Well, they wanted to at first, I mean both of them, I believe, it was him. Well, it was him, (indicating) Detective Craft and his partner, Taliaferro they wanted to, but like I was all drunk, and I guess out of it. And I can't recall what I was saying, but they said well, they didn't want to hear it.
 
 
 23
 Q. Well, did they read you your rights?
 
 
 24
 A. After I got downtown.
 
 
 25
 Q. Did they say you have the right to make a statement if you want?
 
 
 26
 A. Yes.
 
 
 27
 Q. Did they say you have the right to remain silent if you want?
 
 
 28
 A. Yes.
 
 
 29
 Q. Did they say that anything you said could and would be held against you?
 
 
 30
 A. Yes.
 
 
 31
 Q. Did they say that they would provide an attorney for you if you couldn't afford one? Do you remember that?
 
 
 32
 A. They said the Court would.
 
 
 33
 Q. Okay. I'm sorry. You heard that distinctly, they said the Court would?
 
 
 34
 A. Yes.
 
 
 35
 Q. And was this within a short time after you were caught?
 
 
 36
 A. Yes.
 
 
 37
 Q. All right. So you remember that specifically, that they did give you those--make that statement to you?
 
 
 38
 A. Yes.
 
 
 39
 Q. All right. And they never did get a statement from you, right?
 
 
 40
 A. Right.
 
 
 41
 MR. STEIN: Objection.
 
 
 42
 THE COURT: Overruled. He's answered the question.
 
 
 43
 Joint App. at 441-42.
 
 
 44
 Petitioner also contends that the following statements by the prosecutor during his closing argument constituted an improper reference to petitioner's silence:
 
 
 45
 He knows that he comes down to the station. He knows that he's talked to by the police officers. He knows, and I said didn't the police officer tell you this, "you've got the right to remain silent", et cetera? He says, "yeah." Didn't he tell you, "you have a right to an attorney." He says no. And I said, that the Court would appoint an attorney. He said that he knew that. He knew that he stood in a lineup and he knew that people picked him out of a lineup. Okay?
 
 
 46
 Joint App. at 512.
 
 
 47
 The trial court gave the following corrective instruction to the jury:
 
 
 48
 Now, there were some arguments in here, and there was some testimony to the effect that the Defendant did not make a statement to the police. And you will not consider any evidence that the Defendant did not make a statement to the police for any purpose. And you are instructed to disregard that evidence, because the Defendant does not have to make a statement to the police.
 
 
 49
 Joint App. at 513.
 
 
 50
 Petitioner claims that the prosecutor's references to his post-arrest silence violated his rights under Doyle v. Ohio, 426 U.S. 610 (1976). In Doyle, the prosecution tried to show that the petitioners' silence after arrest was an attempt to bide time in order to fabricate a defense, and that any truthful defense would have been offered to the arresting officers. Id. at 616. The Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619. In so concluding, the Court noted:
 
 
 51
 [E]very post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.... Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.
 
 
 52
 Id. at 617-18.
 
 
 53
 With respect to Doyle, this Court has stated:
 
 
 54
 What Anderson v. Charles [447 U.S. 404 (1980) ] teaches is that the Doyle rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the Miranda warnings.
 
 
 55
 United States v. Crowder, 719 F.2d 166, 172 (6th Cir.1983), cert. denied,
 
 
 56
 466 U.S. 974 (1984).
 
 
 57
 Respondent contends that in the present case there was no reliance on Miranda warnings because petitioner did not attempt to remain silent but instead attempted to make a statement. We agree. Although petitioner remained silent, he cannot be considered to have done so in reliance on the implied assurances of the Miranda warnings, for his testimony indicates that he did not remain silent as a matter of choice.
 
 
 58
 Petitioner's situation is further distinguishable from Doyle because the prosecutor, in referring to petitioner's silence, was not attempting to penalize Carpenter for his silence. Carpenter discussed his post-arrest conduct on direct examination. As indicated by his closing argument, the prosecutor questioned Carpenter about his conduct in order to demonstrate that he remembered in great detail the events of the evening. Further, it is unlikely that a negative inference could be drawn from petitioner's silence in light of the fact that his silence was allegedly involuntary. Petitioner's testimony about his post-arrest silence was self-serving insofar as it involved his silence; the testimony was only perhaps harmful insofar as it contributed to the prosecutor's attempt to demonstrate petitioner's ability to remember the events of the evening. Moreover, any negative effect on the jury that petitioner's silence could have had was arguably alleviated by the trial court's corrective instruction.
 
 B.
 
 59
 Petitioner next argues that the District Court erred in failing to find that due process required the trial court to give a jury instruction regarding the lesser included offense of involuntary manslaughter in addition to the instructions given on the offenses of aggravated murder and murder. The Ohio court of appeals found that the state trial court did not err in failing to instruct the jury on involuntary manslaughter. Under Ohio law, an offense is a lesser included offense of another "if the trier of fact is presented with some evidence supporting a finding against the state and for the accused on an element of the greater offense which need not be shown to prove the lesser offense. In such a case an instruction on the lesser included offense is warranted." State v. Solomon, 66 Ohio St.2d 214, 220 (1981). The offenses of aggravated murder and murder require that the perpetrator "purposely ... cause the death of another." Ohio Rev.Code Secs. 2903.1-2. The Ohio Revised Code states that "[a] person acts purposely when it is his specific intention to cause a certain result...." Ohio Rev.Code Sec. 2901.22. Involuntary manslaughter involves a killing that proximately results from the commission or attempt to commit another offense. Ohio Rev.Code Sec. 2903.4. Thus the offenses of aggravated murder and murder require an element (specific intent) that the offense of involuntary manslaughter does not. Ohio law, therefore, would require the trial judge to instruct the jury on involuntary manslaughter if the court were presented with some evidence supporting a finding against the state and for the accused on the element of specific intent.
 
 
 60
 Petitioner's defense in the present case was two-fold: (1) that petitioner was not the assailant; and (2) that if he were the assailant, he was incapable of forming the requisite intent. Petitioner's argument with respect to the failure of the trial court to give a jury instruction on the offense of involuntary manslaughter is based upon two claims: (1) that there was evidence that petitioner was too intoxicated to form the requisite intent; and (2) that there was evidence that the murder occurred too fast for petitioner to form the requisite intent. We find no evidence to support this latter claim. With respect to the first claim, petitioner asserts that there was some evidence introduced at trial supporting the argument that petitioner was too intoxicated to form the requisite intent.
 
 
 61
 In addition to the petitioner, there were two eyewitnesses to the shooting. Jennifer Gardner testified at trial that the petitioner did not appear to be drunk at the time of the shooting. Gardner also admitted that she had previously testified under oath that petitioner appeared to be drunk. She stated that her prior statement was based on the fact that petitioner was loud. Perry Pfaller testified at trial that petitioner did not appear to be drunk.
 
 
 62
 Petitioner testified that he and John Bragg had been driving around getting drunk from 3:00 p.m. until 2:00 a.m., the time of the shooting. Carpenter stated that he had had about a half of a fifth of whiskey as well as at least a case of beer. Later, he stated that he had had a mixed drink at the bar outside of which the shooting took place. Petitioner stated several times that he was drunk throughout the evening of the shooting. His testimony is inconsistent regarding the degree of his intoxication. In response to the question, "[W]hat affect was the alcohol having on you at the time of Al Zednik's death?" petitioner responded, "I understood, I seen what was going on. It wasn't like I was drunk, just out of it, falling around or none of that. I was drunk, very drunk." Joint App. at 438 (emphasis added). Later, however, he stated, "Just, it seems like once I got drunk, I just couldn't get no drunker, or we drank all day, and I wasn't out of it. I seen everything that went on." Joint App. at 440 (emphasis added). Still later, petitioner testified that at least at the time of his arrest, he was "all drunk, and I guess out of it. And I can't recall what I was saying...." Joint App. at 441.
 
 
 63
 The magistrate, and thus the District Court which incorporated the magistrate's decision, stated that "[n]either the testimony of petitioner, nor the other evidence of his drinking, rendered him so drunk that he was unable to form a specific intent to kill [the victim]. There was no reasonable view of the evidence which would conclude Carpenter failed to act purposely." Joint App. at 353. The magistrate further stated, "Although Carpenter said he was drinking to the point of getting drunk that evening, he was not so drunk that he was unable to give a rather detailed version of the events of that evening." Joint App. at 352. We agree. Thus although there appears to be some evidence that petitioner could not have formed a specific intent to kill under the aggravated murder and murder charges, we find that a reasonable juror considering all of the evidence could not reach this conclusion. We find, therefore, that the failure to instruct the jury on involuntary manslaughter was not such a fundamental defect as inherently results in a miscarriage of justice and was not an omission inconsistent with the rudimentary demands of fair procedure.
 
 C.
 
 64
 Petitioner's final argument is that he was improperly sentenced to multiple terms of imprisonment pursuant to Ohio Rev.Code Ann. Sec. 2929.71. This section provides that separate three-year terms of actual incarceration may be added to sentences for certain felonies if the offender was in possession of a firearm while committing the felony. Section 2929.71 also provides, however, that "[i]f any of the felonies were committed as part of the same act or transaction, only one three-year term of actual incarceration shall be imposed for those offenses...." Ohio Rev.Code Ann. Sec. 2929.71.
 
 
 65
 Petitioner contends that the counts against him involving Bobby Joe Jones (charges of felonious assault and aggravated robbery) comprise one transaction. Jones testified at trial that he was assaulted by Pedro Caraballo while he was making a phone call from his car at a phone booth. Jones testified that Caraballo took money from him while Bragg thrust a gun in his face and a third male was yelling that he wanted the car. Jones could not identify the third male. Jones testified that after being robbed, he proceeded to drive away while unsuccessfully attempting to hold onto the gunman's arm. He stopped across the street and a shot was fired at him.
 
 
 66
 The Ohio court of appeals defined the term "transaction" as a series of continuous acts bound together by time, space and purpose, and directed toward a single objective. Petitioner does not contend that this definition does not accurately represent Ohio law. Applying this definition to the Jones robbery and felonious assault charges, we find that these acts do not comprise a single transaction. The two acts were not bound together by purpose and were not directed toward a single objective. The apparent objective of the robbery was to take money from Jones. The shooting comprising the felonious assault took place after the robbery, and thus did not have the objective of acquiring anything from Jones. Therefore, the District Court did not err in finding that these charges did not comprise a single transaction.
 
 
 67
 Petitioner also argues that the felonious assaults of Jennifer Gardner and Perry Pfaller (which were merged into one offense) and the murder of John Zednik were a single transaction. Again, we disagree. The testimony at trial reveals that Gardner and Pfaller were patrons at the bar outside of which the killing took place. When Gardner attempted to get the license plate number of the car driven by the petitioner, Bragg and Caraballo, petitioner turned around to face her, pointed the gun at her, and kicked her. Petitioner then turned around and shot Zednik. Petitioner's purpose in pointing the gun at Gardner was apparently to frighten her in order to keep her from finding out information that could enable him to be traced. His objective in shooting Zednik is not apparent, but nothing in the record indicates that his objective was similar to his objective in threatening and kicking Gardner. Further, it is unlikely that a single transaction can exist where two different crimes have been perpetrated against two different victims. Thus we find that petitioner's argument that he was improperly sentenced to multiple terms of imprisonment pursuant to Ohio Rev.Code Ann. Sec. 2929.71 is without merit.
 
 
 68
 For the foregoing reasons, we AFFIRM the judgment of the District Court.
 
 
 69
 KENNEDY, Circuit Judge, dissenting.
 
 
 70
 Portions of petitioner's testimony indicate that he was perhaps so intoxicated that he was unable to form a specific intent. The fact that he was later able to give a detailed version of the events of the evening of the shooting does not require the conclusion that no reasonable juror could have found that he was incapable of forming a specific intent at the time of the shooting. Thus were I in the majority I would be required to address the issue faced by our Court in Bagby v. Sowders, 894 F.2d 792 (6th Cir.1990) (en banc ). However, because I am dissenting, I see no need to address this difficult issue.