# IN THE COURT OF APPEALS OF IOWA

No. 16-1906
Filed November 8, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SHAUN SIMONICH,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.

Defendant appeals his convictions for sexual abuse in the second degree and incest. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., McDonald, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**BLANE, Senior Judge.**

Appellant Shaun Simonich appeals his convictions and judgment following a bench trial and verdict finding him guilty of sexual abuse in the second degree, a class "B" felony, in violation of Iowa Code section 709.3 (2015); and incest, a class "D" felony, in violation of Iowa Code section 726.2. On appeal he asserts the verdicts are not supported by substantial evidence and his trial counsel was ineffective in numerous ways, including failing to file a motion for new trial challenging the trial court's findings as to credibility and DNA evidence, failing to object to claimed vouching testimony of two witnesses, and failing to object to the trial judge's questioning of two witnesses. Simonich asserts there was cumulative error. For reasons discussed below, we find sufficient evidence supports the guilty verdicts, defense counsel was not ineffective, and there was not cumulative error. We therefore affirm the convictions and judgment.

I.      **Procedural Background.**

On March 10, 2015, the State charged Simonich with sexual abuse in the second degree and incest. Simonich was arraigned and entered a plea of not guilty. On June 24, 2016, Simonich filed a written waiver of his right to a jury trial. After confirming the waiver of a jury on the record, the court held a bench trial on July 6 and 7. The matter was submitted to the district court for ruling. On September 6, the district court issued written findings of fact and verdicts finding Simonich guilty as charged. The court sentenced Simonich on October 31. Simonich timely filed a notice of appeal on November 7.

## II.    Factual Background.

L.S., the son of Simonich, was born in January of 2005.  On February 16, 2015, L.S. was at home, where he lived with his mother and Simonich.  L.S. came into the living room to talk to his father.  Simonich was sitting in a rocking chair.  After talking, Simonich pulled down his own pants and then pulled down L.S.'s pants, picked L.S. up and placed him on his lap, with L.S. facing away from Simonich.  Simonich's hands were on L.S.'s waist and he moved L.S. onto his penis, which he inserted approximately three inches into L.S.'s anus, hurting L.S. L.S. testified Simonich did not touch his (L.S.'s) penis or move other than to put L.S. on Simonich's penis.  According to L.S., the incident lasted approximately fifteen minutes before his mother walked into the room and saw them.

L.S.'s mother, Carol, had been in the home office.  She walked into the living room and saw Simonich with L.S. on his lap.  She testified that Simonich had been drinking heavily and refusing to take his medications for several days. She observed Simonich and L.S. had their pants pulled down and they appeared to be "having sex."  L.S. was sitting "on top of Shaun with his back facing towards Shaun.  And then he [Simonich] was moving in a motion like a sexual motion." Carol was shocked and asked what was happening; Simonich said he was "fucking his son."  Simonich then asked his wife if she "wanted to suck his dick too."  Carol walked outside and called the police to report that her husband was molesting their son.

According to L.S., his mother walked outside to call the police and Simonich pushed L.S. off of his lap, pulled up his own pants, and followed her outside.  Police officers arrived quickly afterward.  When L.S. initially spoke with

an officer, he was "very scared so I kind of really didn't answer. But the second time I got calmed down and then I told him." L.S. was afraid that "[his] dad was going to get in trouble." Later, when the officer spoke to L.S. again, L.S. told him that "my dad put his penis into my butt."

Officers collected the clothing worn by Simonich and L.S. that day and arranged an interview, physical exam, and a sexual assault kit for L.S. at the Child Protection Center (CPC) that evening. The CPC forensic interviewer, Katie Strub, testified L.S. was unemotional and did not offer information to her unless she asked, but when asked, he answered her questions. She also testified L.S.'s demeanor during the interview was "consistent with [her] knowledge and experience in this field."

At the CPC, a nurse practitioner, Julie Ritland, physically examined L.S. and completed the sexual assault kit by swabbing L.S. for DNA testing. At trial, Ritland could not remember how many swabs she did, but she probably swabbed between L.S.'s legs, around his anus, and a small amount in the anus based on the allegations. Contrary to procedure, two swabs were both placed in the same sleeve, allowing for possible cross-contamination. Police swabbed Simonich's penis and obtained a buccal swab from Simonich for DNA testing. DNA analysis revealed that a profile matching Simonich's was detected on either L.S.'s inner thigh or on the outside of L.S.'s anus. Simonich's genetic profile was also discovered on his son's underwear. In both instances, the likelihood of another person matching Simonich's DNA profile was determined to be less than 1 in 100 billion.

**III.** **Discussion.**

**A. Whether the State Presented Substantial Evidence Establishing that Simonich Sexually Abused L.S.**

**i.** **Standard of Review.**

This court reviews sufficiency-of-the-evidence challenges for the correction of errors at law. *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). We review a district court's findings following a bench trial as we would a jury verdict. *State v. Weaver*, 608 N.W.2d 797, 803 (Iowa 2000). A district court's finding of guilt is binding on the appellate court unless we determine the record lacked substantial evidence to support the finding of guilt. *State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997).

In evaluating challenges to the sufficiency of the evidence, we review the record in a light most favorable to the State; the court makes any legitimate inferences and presumptions that may fairly and reasonably be deduced from the evidence in the record. *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002). The test for whether the evidence is sufficient to withstand appellate scrutiny involves an inquiry as to whether the evidence is "substantial." *State v. Astello*, 602 N.W.2d 190, 197 (Iowa Ct. App. 1999). "Substantial evidence does not, however, denote some elevated quantity of proof." *Id.* The findings of the factfinder are to be broadly and liberally construed, rather than narrowly, and in cases of ambiguity, they will be construed to uphold, rather than defeat, the verdict. *State v. Dible*, 538 N.W.2d 267, 270 (Iowa 1995). It is necessary to consider all the evidence in the record and not just the evidence supporting the verdict to determine whether

there is substantial evidence to support the charge. *State v. Bass,* 349 N.W.2d 498, 500 (Iowa 1984) (quoting *State v. Blair,* 347 N.W.2d 416, 419 (Iowa 1984)).

Evidence meets the threshold criterion of substantiality if it would convince a rational factfinder that the defendant is guilty beyond a reasonable doubt. *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008). "The [factfinder] is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).

### ii. Merits.

In this case, the only element in dispute at trial for either offense was whether a sex act occurred. A person who performs a sex act with a child under twelve years of age commits second-degree sexual abuse. Iowa Code § 709.3(1)(b). A person who commits a sex act with another known to be a "person, either legitimately or illegitimately, as [a] descendant . . . , commits incest. Incest is a class 'D' felony." Iowa Code § 726.2. A "sex act" is defined as

> [A]ny sexual contact between two or more persons by any of the following:
> 1. Penetration of the penis into the vagina or anus.
> 2. Contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person.
> 3.Contact between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment . . . .
> 4. Ejaculation onto the person of another.
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

Iowa Code § 702.17.

In this case, the State presented substantial evidence establishing that Simonich sexually abused ten-year-old L.S. As detailed above, L.S. testified that his father pulled down his own pants and then L.S.'s pants while Simonich was sitting on a chair in the living room, positioned L.S. on his lap, and inserted his penis into L.S.'s anus. The trial court found the child to be "particularly credible regarding his recitation of the incident."

L.S.'s mother and Simonich's wife, Carol, was an eyewitness to her intoxicated husband's sexual abuse of their son. As she walked into the living room, she saw her son on his father's lap, both with their pants pulled down. Carol witnessed Simonich and their ten-year-old son "having sex," or moving "back and forth" in a "sexual way." Simonich told his wife he was "fucking his son" and asked her if she would like to perform oral sex on him. She immediately walked outside and called the police.

Physical evidence also corroborated the accounts of L.S. and Carol Simonich. DNA evidence linking Simonich to the sexual abuse of his son was presented at trial. Genetic material matching Simonich's DNA profile was found on his son's inner thigh or the outside circumference of his anus. Further, DNA matching Simonich's genetic profile was also detected in L.S.'s underwear. In both instances, the likelihood of another person matching Simonich's DNA profile was determined to be less than 1 in 100 billion.

The district court made the following fact findings:

> The Court finds from the credible testimony of L.S. and from the DNA evidence submitted that contact occurred between the genitalia or penis of the defendant and the anus of L.S. The child testified the defendant inserted his penis into L.S.'s anus. Whether actual penetration occurred is irrelevant. Contact is all that is

necessary. The Court finds the requisite contact between the defendant's penis and the victim's anus occurred with proof beyond a reasonable doubt. The Court further finds with proof beyond a reasonable doubt the act or contact was sexual in nature.

The district court's findings are supported by substantial evidence establishing that Simonich was guilty of second-degree sexual abuse and incest.

Simonich also challenges the DNA evidence presented at trial. As indicated, the sexual assault kit containing samples taken from L.S.'s body included a "miscellaneous" envelope with a swab labeled "inner thigh" and a swab labeled "circumferential anus." Both swabs were placed in one sleeve inside the miscellaneous collection envelope. Nurse practitioner Julie Ritland testified that she and another nurse completed the sexual assault kit in this case and that the two swabs would have ideally been put into different sleeves so that there would be no possibility of commingling. The criminalist who performed the DNA testing, Tara Scott, testified that she tested one of the two swabs labeled "inner thigh/circumferential anus" from inside the miscellaneous collection envelope. She opined that the risk of commingling was possible, but unlikely, and would result only if the swabs were "soaking wet."

The district court considered this testimony and ruled that the potential commingling of the two swabs in the same sleeve went to the weight of the evidence rather than its admissibility. As the court correctly noted,

> the fact remains, even if the [samples] were commingled, even if these samples were ultimately cross-contaminated, all that suggests to me is that either this DNA sample was found in the thigh area or . . . it was found in the circumference of the anus. It doesn't tell me with any degree of specificity that it occurred in one over the other, but the results tell me that DNA was present in one of those two places.

In later summarizing the testimony in its findings, the court went on to find:

> The swab from the inner thigh and/or the circumference of the anus of L.S. was tested. The profile developed indicated the presence of a mixture of DNA from more than one contributor. The profile of the major contributor was developed and determined to match the defendant. The major DNA profile developed from the inner thigh and/or the circumference of the anus of L.S. matched the known DNA profile of the defendant. The probability of finding this profile in a population of unrelated individuals chosen at random would be less than 1 out of 100 billion. Much emphasis was placed upon the commingling of the swabs. Clearly the act was in error. Clearly the act was against all acceptable protocols. The transfer of DNA is problematic; however, in the end, the defendant's DNA was determined to be present in either the circumference of L.S.'s anus or in the inner thigh of L.S. (which was described to have been swabbed in very close proximity to the circumference of the anus and was no more than an inch apart).

The substance of Julie Ritland's testimony supports the court's conclusions about the procedures employed. The factfinder could, and did, evaluate the DNA evidence in light of the witness's testimony, and correctly determined that ultimately, the incorrect placement of the two swabs in one sleeve was of little consequence. The mistake with the swabs did not negate Ritland's knowledge of the underlying procedures employed in the course of her duties as a nurse practitioner, trained in the collection of bodily samples. In addition, as noted, Simonich's genetic profile was discovered not only on his son's body but on his underwear, with no corresponding commingling claim. The district court properly considered the DNA evidence, and it does not provide a basis for us to find a lack of substantial evidence to support Simonich's convictions.

### B. Whether Trial Counsel Rendered Effective Assistance.

#### i. Standard of Review.

Ineffective-assistance-of-counsel claims are reviewed de novo. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010).

#### ii. Merits.

To prevail on an ineffective-assistance-of-counsel claim involving complaints of specific acts or omissions, the defendant must show that "(1) counsel failed to perform an essential duty, and (2) prejudice resulted therefrom." *State v. Fountain*, 786 N.W.2d 260, 265–66 (Iowa 2010). Ultimately, the test of ineffective assistance of counsel rests on whether counsel's performance was reasonably effective; the defendant must show that the performance fell below an objective standard of reasonableness such that his lawyer was not functioning as "counsel" as guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

Judicial scrutiny of counsel's performance is highly deferential, and this court indulges in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. A defendant is not entitled to perfect representation but rather only that which is within the range of normal competency. *State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). "Improvident trial strategy, miscalculated tactics, [or] mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *Osborn v. State*, 573 N.W.2d 917, 922 (Iowa 1998).

Resolution of claims of ineffective assistance of counsel is generally reserved for postconviction review by appellate courts because of the seriousness of the claim to counsel, whose performance is being challenged, as well as the fairness to the proceedings in which the ineffective assistance is alleged to have occurred. *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997). If a defendant wishes to have an ineffective-assistance claim resolved on direct appeal, the defendant will be required to establish an adequate record to allow the appellate court to address the issue. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010). If the defendant requests that the court decide the claim on direct appeal, it is for the court to determine whether the record is adequate and, if so, to resolve the claim. *Id.* If, however, the court determines the claim cannot be addressed on appeal, the court must preserve it for a possible postconviction-relief proceeding, regardless of the court's view of the potential viability of the claim. *Id.* Upon our review, we find the record adequate to address the ineffective-assistance claims here.

### a. Failing to Object to Claimed Vouching Evidence.

Simonich contends that defense counsel should have made two evidentiary objections based on an improper vouching theory under *State v. Dudley*, 856 N.W.2d 668 (Iowa 2014). He asserts counsel was ineffective for failing to do so.

#### 1. Katie Strub.

At trial, Katie Strub testified:

> Q. What were your observations of [L.S] during that interview? A. Um, [L.S.] was very reserved during the interview. His affect was very flat, and by that I mean he was pretty

unemotional. He did not offer much information to me unless I asked him specifically for it. But when I did ask him questions, he did answer them and even clarify when I didn't understand.

Q. And were his statements to you during the interview consistent throughout your interview? A. Yes.

Q. And was your description of his demeanor during your interview consistent with your knowledge and experience in this field? A. Yes.

In the findings, the trial judge summarized this testimony: "Ms. Strub testified L.S. was reserved, unemotional, and would not offer information unless asked directly, but L.S.'s *behavior* was *consistent with individuals of his age who have gone through similar situations*." (Emphasis added.) Simonich contends this last comment is not only a misstatement of the testimony but also constitutes expert vouching for the credibility of L.S.

A witness may not directly or indirectly opine on the credibility of another witness. *See Dudley*, 856 N.W.2d at 676. Iowa courts "are generally committed to a liberal rule which allows opinion testimony if it will aid the jury in screening the properly admitted evidence to ascertain the truth." *State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986). However, this liberal rule does not extend to opinion testimony that vouches for or bolsters the credibility of another witness. *See, e.g., Dudley*, 856 N.W.2d at 676 ("We see no reason to overturn this well-settled Iowa law prohibiting an expert witness from commenting on the credibility of a victim in a criminal sex abuse proceeding."); *see also* Iowa R. Evid. 5.701 (limiting the opinion testimony of a lay witness). "Our system of justice vests the [factfinder] with the function of evaluating a witness's credibility." *Dudley*, 856 N.W.2d at 677 (citing *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992)).

"[V]eracity is not a 'fact in issue' subject to expert opinion." *Hulbert*, 481 N.W.2d at 332.

Strub did not technically use the language attributed to her. She answered yes to a leading question posed by the State's attorney, which used the word "demeanor." The district court used the word "behavior." Although not identical, the words are sufficiently similar in meaning that it cannot be found the court misstated Strub's testimony. The leading question then asked if L.S.'s demeanor was "consistent with your knowledge and experience in this field," to which witness Strub's answer was "yes." The district court's findings interpreted this as Strub testifying L.S.'s demeanor or behavior was "consistent with individuals of his age who have gone through similar situations." We agree that Strub's actual testimony does not support the trial court's written finding and this was a misstatement.

Our inquiry does not stop here. Was Strub's actual testimony a vouching for L.S.'s credibility? The leading question asked Strub about consistency with her own knowledge and experience in the field; it did not mention anything about children, or those of a similar age to L.S., or L.S. going through similar situations as other children. Strub's affirmative answer to the question was that L.S.'s demeanor was consistent with her "knowledge and experience in this field." What her knowledge and experience are was not offered. It is unknown if that knowledge and experience is that children with L.S.'s demeanor are truthful or untruthful. We find Strub's testimony was neither a direct nor even an indirect vouching.

Assuming arguendo that counsel should have lodged an objection, however, Simonich cannot establish resulting prejudice, as he must. As indicated, the court found L.S. "particularly credible" at trial and did not mention Strub's testimony when making this specific finding. *See State v. Prince*, No. 16-1455, 2017 WL 3525152, at *2 (Iowa Ct. App. Aug. 16, 2017) (holding improper vouching testimony was *not* prejudicial where the court did not rely on the statement in making its determination of guilt). Again, in light of the mother's eyewitness testimony and the DNA evidence implicating Simonich, both of which corroborated L.S.'s account, Simonich cannot establish that an objection to Strub's testimony in this regard would have resulted in his acquittal.

### 2. Julie Ritland.

Simonich claims his trial counsel should have objected to testimony from nurse practitioner Julie Ritland as to the sexual assault. Ritland responded to a general question about a lack of physical findings in a sexual assault scenario, that "[r]esearch shows that the majority of anal penetration does not result in injury. The vast majority of the time there is no injury associated with anal penetration."

This testimony did not vouch for the credibility of a witness, as prohibited by *Dudley*. The statement was recitation of a medical fact designed to educate the trier-of-fact on a subject with which the court would likely be unfamiliar. Expert testimony couched in general terms dispelling a common misconception is admissible, even under *Dudley*. *See* 856 N.W.2d at 675–76 (noting that expert testimony in child sex abuse cases can be "very beneficial" to assist the jury and dispel misconceptions); *see also State v. Moore*, No. 10-1902, 2012 WL

3195779, at *7–8 (Iowa Ct. App. Aug. 8, 2012) (finding gynecologist's testimony "[t]here is no pattern of physical findings that is indicative one way or the other of sexual assault" and "it is common to find no injuries to sexual assault because adult sex organs are anatomically designed 'to fit together'" was not improper vouching testimony); *Brown v. State*, No. 03-1520, 2004 WL 2387044, at *2 (Iowa Ct. App. Oct. 27, 2004) (finding no vouching impropriety from medical expert's testimony in a sexual abuse case that child's rectal injuries were not caused by a bowel movement).  The same is true here.  Defense counsel had no duty to object to admissible medical evidence couched in general terms and was not ineffective in this regard.

### b. Failure to File Motion for New Trial.

Simonich contends defense counsel was ineffective in not filing a motion for new trial based on the alleged misstatements or misinterpretations in the district court's factual findings of the trial testimony.  Simonich takes issues with Strub's testimony regarding L.S.'s demeanor during the interview as consistent with her experience and Ritland's testimony concerning the location and improper preservation of the swabbing of L.S.'s body.

Simonich asserts that the district court relied on facts outside the record, citing *State v. Blanford*, 306 N.W.2d 93, 98 (Iowa 1981).  As noted above, the district court made a misstatement in its findings when it found Strub testified that L.S.'s behavior was "consistent with individuals of his age who have gone through similar situations."  Our review of the record shows she did not state this.

However, our review also shows that contrary to the district court's finding, which would have been vouching testimony, Strub's testimony was not vouching.[1]

The defendant still shoulders the burden to establish a reasonable likelihood that the result of the proceeding would have been different under *Strickland*. *See generally Everett*, 789 N.W.2d at 157–58 (distinguishing between the burdens and standards for preserved claims and ineffective-assistance-of-counsel claims). Simonich asserts the ineffectiveness was in his trial counsel's failure to file a motion for new trial. His claim fails for two reasons. First, if trial counsel had filed a motion for new trial based upon the court's misstatement, since this was a bench trial, the district court could have corrected the misstatement. As we found above, the district court made no error as to Ritland and the DNA evidence.

We are even more convinced that Simonich cannot prevail on this claim because he cannot prove the second prong under *Strickland* of prejudice. Here, given the strength of the State's case against him, Simonich cannot established a reasonable likelihood that the challenge to the court's findings on two minor points of evidence had any effect on these convictions, and his claim of ineffective assistance on this point is rejected.

---

[1] In sex-abuse cases where the State's case rests on a witness's credibility, improper vouching is prejudicial. *See, e.g.*, *State v. Tjernagel*, No. 15-1519, 2017 WL 108291, at *8 (Iowa Ct. App. Jan. 11, 2017) (finding prejudice where "the State's case . . . rested entirely on the credibility of the witnesses[,] . . . [t]here was no physical evidence of the alleged abuse and no witnesses other than the complaining witness," and "the expert witnesses' vouching testimony here 'was pervasive—not just a single statement'" (citation omitted)). However, here we find the misstatement was in finding vouching testimony, when in fact, the actual testimony does not rise to the level of vouching.

### c. Failing to Object to the Trial Court's Questioning of Witnesses.

Simonich next contends defense counsel should have objected to the trial court questioning L.S. and criminalist Tara Scott. Iowa Rule of Evidence 5.614(b) provides: "*Examining.* When necessary, the court may examine a witness regardless of who calls the witness." Our supreme court has recognized the power of the trial judge to question witnesses, even in a criminal case, but it has cautioned against assuming the role of an advocate. *State v. Thornburgh*, 220 N.W.2d 579, 585 (Iowa 1974). Judges are encouraged not to enter the fray with their own interrogation of witnesses. And when cause to do so exists, restraint must be used. By engaging in the examination of witnesses the court becomes vulnerable to a multiplicity of criticisms; bias, prejudice, or advocacy are some of those. "It must always be borne in mind that jurors are particularly sensitive to the presiding judge's views and may be unduly influenced by what they perceive those views to be." *State v. Cuevas*, 288 N.W.2d 525, 532–33 (Iowa 1980) (citation omitted). The trial judge's role is more than that of a "mere moderator"; "the trial judge may ask questions of witnesses in an attempt to clarify testimony and to elicit facts necessary to a clear presentation of the issues." *State v. Dixon*, 534 N.W.2d 435, 441 (Iowa 1995), *abrogated on other grounds by State v. Huss*, 657 N.W.2d 447, 453–54 (Iowa 2003).

Here, after the State's redirect examination, the court asked L.S.—who had previously testified that his mother had walked outside after witnessing the abuse and called 911—whether he actually heard her or just surmised what had

occurred. L.S. clarified that he "kind of figured that she was calling the cops" but had not overheard the conversation.

After receiving direct, cross-examination, redirect, and re-cross examination testimony on the subject of Simonich's DNA match, the court asked criminalist Tara Scott if the underwear results were from a stain or a cutting, and asked where on the underwear the sample was located. Scott explained she conducted an alternate light source screening test for seminal fluid on L.S.'s underwear and took a cutting from the area covering the buttocks.

Simonich contends defense counsel had an obligation to object to the district court's questioning of these two witnesses. Counsel had no reasonable basis to conclude, however, that the district court had overstepped its bounds in asking a few clarifying questions. Like the court's inquiries in *State v. Peterson*, No. 05-0582, 2006 WL 1628047, at *5 (Iowa Ct. App. June 14, 2006), the court's questioning here was "limited in scope, neutrally phrased, and not designed to elicit any particular response." The court's query about whether L.S. had actually heard his mother phoning 911 when she stepped outside was a natural question flowing from the testimony, and the location of Simonich's DNA on his son's underwear was of interest, especially in light of the potentially commingled bodily DNA samples involving the inner thigh and circumference of the anus. The court did not take on the role of an advocate; it simply elicited admissible facts by asking impartial questions. The court also gave the lawyers the opportunity to ask additional follow-up questions based on its questioning, which was declined in one instance and accepted in the other.

We conclude the court's questioning was not only appropriate under the legal standard discussed above, it was also not prejudicial to Simonich and did not demonstate any bias on the part of the court. Even critical evidence elicited by questions from the court does not establish that the court abused its discretion; "[a] trial is not a game; it is a serious quest for the truth." *Peterson*, 2006 WL 1628047, at *4 (quoting *Mills v. State*, 386 N.W.2d 574, 576 (Iowa 2006)).

We also note that much of the concern with a court's questioning of witnesses is its potential impact on a jury. *Cuevas*, 288 N.W.2d at 532–33. This was not a concern here since this was a bench trial. No jury heard the court's questions. "A trial judge is allowed greater latitude to comment during a bench trial than might be acceptable during a jury trial." *In re Marriage of Worthington*, 504 N.W.2d 147, 149 (Iowa Ct. App. 1993). Concerns that arise when jurors hear questions posited by the judge are simply not present in the context of a bench trial. Defense counsel was not ineffective in declining to object.

Simonich suggests that this court view the district court's conduct here as structural error. Structural errors are not mere errors in the proceeding, but errors affecting the entire framework of the trial, such as an actual or constructive complete denial of counsel or the absence of any meaningful adversarial testing. *Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011). Prejudice may be presumed if structural error occurs. *Id.* The United States Supreme Court recently observed, however, that when structural error is alleged in the context of ineffective assistance of counsel rather than on a preserved claim, a showing of prejudice is generally nonetheless required:

> In the criminal justice system, the constant, indeed unending, duty of the judiciary is to seek and to find the proper balance between the necessity for fair and just trials and the importance of finality of judgments. When a structural error is preserved and raised on direct review, the balance is in the defendant's favor, and a new trial generally will be granted as a matter of right. When a structural error is raised in the context of an ineffective assistance claim, however, finality concerns are far more pronounced.

*Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017) (requiring petitioner to demonstrate prejudice in the context of a structural error/ineffective-assistance claim).

On this claim, Simonich cannot prevail. We have found that his counsel was not ineffective in not objecting to (1) the testimony of witnesses Strub and Ritland and (2) the trial judge's questioning of two witnesses. Since we have not found counsel ineffective, we cannot find structural error premised on those claims, and this claim is rejected.

### d. Cumulative Error.

Simonich finally contends that he is entitled to relief on ineffective-assistance grounds based on the cumulative-error doctrine. As discussed above, we have found that none of Simonich's allegations of ineffective assistance have merit. We similarly find there is no cumulative error.

Moreover, the evidence establishing that Simonich committed second-degree sexual abuse and incest was overwhelming. Given L.S.'s credible testimony, the eyewitness testimony from Carol Simonich observing her husband in the act of sexually abusing their son, and the DNA evidence implicating Simonich, any alleged errors on counsel's part, alone or in tandem, had no effect on the guilty verdicts. There is no reasonable likelihood of a different verdict,

even if his trial counsel had performed differently, in light of the strength of the evidence against him.

**IV. Conclusion.**

Having addressed each of Simonich's appeal points and finding none have merit, his convictions for sexual abuse in the second degree and incest are affirmed.

**AFFIRMED.**