STATE of Iowa, Appellee,

v.

Clyde Jack BASS, Appellant.

No. 69503.

Supreme Court of Iowa.

May 16, 1984.

Paul H. Rosenberg of Rosenberg & Margulies, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Teresa M. Baustian, Asst. Atty. Gen., and William Thomas, Asst. County Atty., for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, McGIVERIN, and LARSON, JJ.

McGIVERIN, Justice.

Defendant Clyde Jack Bass appeals his conviction for first-degree murder in violation of Iowa Code sections 707.1 and 707.2 (1981). He asserts: (1) that the evidence was insufficient to support the jury's verdict of guilt; (2) that he was denied due process and a fair trial due to prosecutorial comment on his post-arrest silence; (3) that he was denied due process and a fair trial as a result of the State's failure to preserve evidence of a photo array, and because of the court's failure to instruct the jury that it was permitted to draw an inference adverse to the State as a result of the missing photo array evidence; and (4) that he was denied a fair trial due to the cumulative effect of various specified errors. Defendant also reasserts the speedy trial issues decided adversely to him in *State v. Bass*, 320 N.W.2d 824 (Iowa 1982), solely for the purpose of error preservation. We find no merit in any of defendant's assignments of error and therefore affirm defendant's conviction.

Defendant was charged with first-degree murder, Iowa Code sections 707.1 and 707.-2, arising out of the slaying of William "Billy" Grimm, who was pulled out of a burning Holiday Inn motel room in Des Moines on June 11, 1978, with multiple gunshot wounds to his head and torso along with third-degree burns over sixteen percent of his body.

Facts concerning defendant's arrest in California, his extradition to Iowa, and his motion to dismiss the trial information were discussed in *State v. Bass*, 320 N.W.2d 824, and will not be repeated here. Additional facts brought out at trial will be noted where deemed pertinent to defendant's assignments of error.

I. *Sufficiency of the evidence.* At trial, defense counsel made timely motions for a judgment of acquittal, specifically claiming the evidence was insufficient on the issue of identity of the perpetrator. The court overruled the motions. The jury subsequently returned its verdict finding defendant guilty of first-degree murder.

Defendant contends "there was insufficient evidence that [he] was the person who shot Billy Grimm."

The principles of law for reviewing a motion for judgment of acquittal based on sufficiency of the evidence are well established:

When reviewing the sufficiency of evidence, we view the evidence in the light most favorable to the State, including all legitimate inferences and presumptions which may fairly and reasonably be deduced from the evidence in the record. It is necessary to consider all of the evidence and not just the evidence supporting the verdict. A jury verdict is binding upon this court and will be upheld unless the record lacks substantial evidence to support the charge. Substantial evidence means evidence which would convince a rational trier of fact that the [defendant is] guilty of the crime charged beyond a reasonable doubt.

*State v. Blair*, 347 N.W.2d 416, 418 (Iowa 1984).

From the evidence presented at trial, the jury could have found the following facts.

In the early part of June 1978, defendant Clyde Jack Bass and victim Billy Grimm, both residents of California, burglarized the Las Vegas, Nevada, home of Ty Havas. A large amount of jewelry and numerous guns were taken including a .38 caliber Smith & Wesson.

Grimm then drove alone to Des Moines in a car registered to Bass with the stolen goods while Bass travelled to Des Moines via a commercial airline. Bass and Grimm intended to sell the stolen goods in Des Moines because of the reputed relatively high price being paid there for stolen goods by dealers of such commodities.

Bass and Grimm rendezvoused in Des Moines on June 9, 1978, at the Holiday Inn-North where Grimm had registered two guests for room 151. Grimm indicated on the registration card that his automobile was a 1967 Oldsmobile with California license plate VEP864.

On June 11, motel guests heard an explosion and thereafter discovered smoke pouring out of room 151. Billy Grimm's body was retrieved from his motel room through a heroic effort by a motel guest, Arlan Main, who spotted Grimm lying on a bed in the burning room and then placed his own life in peril by entering the room, which by that time had become engulfed in flames and dense smoke. Grimm was pronounced dead on the scene. It was apparent to onlookers that Grimm's body was punctured with four gunshot wounds, two in the head and two in the upper torso.

The autopsy report indicated that Grimm had died prior to the fire as a result of the gunshot wounds which had been inflicted by a .38 caliber firearm.

A ballistics expert testified that the bullets recovered from Grimm's body were identified as .38 caliber Smith & Wesson lead bullets.

A thorough search through the gutted motel room uncovered numerous firearms (but not a .38 caliber gun), ammunition, a red and yellow two gallon gas can which contained gasoline, a large quantity of jewelry, and a half-gallon whiskey bottle.

A fire inspector testified that the fire had been set deliberately by means of a flammable substance, apparently gasoline.

Defendant testified that he was visiting an uncle near Montezuma, Iowa, at the time Billy Grimm was found shot in the blazing motel room. He said that he returned to the motel, observed the commotion of police officers and firefighters near his motel room, and then fled to California out of fear that the police would connect him with the stolen weapons that were left in the motel room.

There was substantial circumstantial evidence, however, connecting defendant with the murder of Billy Grimm. Circumstantial and direct evidence are equally probative. Iowa R.App.P. 14(f)(16). "Whether the evidence is direct or circumstantial, however, it must raise a fair inference of guilt; it must do more than create specula-

tion, suspicion, or conjecture." *State v. Blair*, 347 N.W.2d at 421.

The State's evidence permitted the jury to find that the defendant was with the deceased throughout the day of the murder and present at the murder scene; that the defendant had access to a gun of the same make and style as the murder weapon; that the defendant purchased the gasoline which was used to set the motel room on fire; and that defendant fled the scene of the murder to California, changed his name, and concealed his location from his live-in girlfriend.

■ A. *Proximity to crime.* While mere presence of a person at the time and place of a homicide is not sufficient evidence alone to establish that person's participation in a murder, it is circumstantial evidence that may be considered, and which may, under the surrounding facts and circumstances in a given case, be entitled to great weight. *State v. Schrier*, 300 N.W.2d 305, 309 (Iowa 1981). Evidence of defendant's proximity to the crime in this case is particularly probative because it impeaches and substantially undermines defendant's alibi that he was near Montezuma visiting a relative when the victim was killed. *See State v. Odem*, 322 N.W.2d 43, 47 (Iowa 1982) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt. The false story is relevant to show that a defendant fabricated evidence to aid his defense.").

The State produced evidence that the defendant was in the motel room, which he shared with Grimm, on June 11. Steven Murray, a Holiday Inn employee, testified that he saw the defendant and the deceased several times on the day of the murder. He saw the two men together in the motel parking lot at about 3:00 p.m.; about one or two hours later he saw the defendant when he came to the motel restaurant to talk about paying for room service; and still later, at about 5:00–6:00 p.m. he saw both men inside room 151 when he delivered a room service food order. Murray testified that the defendant answered the door and gave him a tip. Murray identified the defendant in court as the same man he saw with the victim on June 11. Murray recalled that the man who answered the door when he delivered the room service order had a tatoo on his arm. Defendant was observed to have a tatoo on his arm when he was directed to roll up his sleeves in court before the jury. The evidence also showed that Murray made a correct identification of the defendant from a nonsuggestive photo array a few days after the murder. (See division III concerning Murray's initial misidentification.)

Defendant was also placed, shortly before the explosion and fire, within one block of the Holiday Inn purchasing gasoline in a two gallon container, similar to the gas can found in the charred remains of room 151. James Golden, an employee at a Clark service station located within one block of the Holiday Inn-North, testified that on June 12, 1978, after reading about the fire in the newspaper, he contacted the police to report that he suspected a man he sold gasoline to the night before might have been involved in the arson and murder. Golden told the police, and later testified, that a man, whom he identified in court and in a nonsuggestive photo array as the defendant, pulled into the Clark station at approximately 8:30 p.m. driving a 1965 or 1966 Oldsmobile with California license plates and with a large dent in the left front fender. He said the defendant purchased a red and yellow gas can and had it filled with gasoline. This can was similar to the one found in the motel room. The car, with the dent in the fender, was similar to the one defendant abandoned near Montezuma during his flight to California.

B. *Access to firearm similar to murder weapon.* Additional incriminating circumstantial evidence is that defendant had access to a firearm of the nature used to kill Billy Grimm.

As noted earlier, among the items that Bass and Grimm stole from the home of Ty Havas was a .38 caliber Smith & Wesson gun which was loaded at the time. A bal-

listics expert testified that the bullets removed from the body of Billy Grimm were .38 caliber Smith and Wesson class lead bullets. The bullets had five lands and grooves with a right-hand twist which indicated that the bullets could have been fired from several makes of guns including a .38 caliber Smith & Wesson.

C. *Flight.* Bass testified that after he knew Grimm was dead he abandoned his 1967 Oldsmobile near Montezuma and flew to Chicago to catch a flight to Los Angeles. In Los Angeles, Bass attempted to conceal his identity. He changed his name, assuming an alias, and failed to call or inform his live-in girlfriend of his location. We have recognized that an individual's flight from the scene of a crime is a circumstance from which a jury may find the defendant departed because of his consciousness of guilt. *State v. Webb*, 309 N.W.2d 404, 409 (Iowa 1981).

Defendant argued that he fled because he did not want to be connected with the Havas burglary and that he didn't call his girlfriend out of fear that she would turn him in to the authorities for the burglary. However, the underlying reason for fleeing, and the inferences to be derived therefrom, are factual issues for the jury to determine. *See State v. Blair*, 347 N.W.2d at 422.

We conclude there was substantial evidence in the record to support the court's submission of the charge of first-degree murder to the jury. We hold the trial court did not err in overruling defendant's motions for a judgment of acquittal.

II. *Prosecutorial comment on defendant's post-arrest silence.* Defendant was arrested on February 25, 1981, on the present charge and given his *Miranda* warning. Defendant testified at trial. He admitted being in Des Moines with Grimm on June 11. Bass testified rather freely concerning his movements with Grimm from California to Las Vegas and Des Moines. He said they were in Des Moines to sell the stolen jewelry and guns. An implication could be drawn from his testi-

mony that prospective purchasers had killed Grimm.

During the course of cross-examination, the prosecutor asked defendant the following question:

Q. Mr. Bass, isn't it true that this whole time from June 11th, 1978, until today, October 12th, 1982, this is the very first time that you have ever told this story about somebody—the bad guys shooting Billy, or the— A. I never said anybody shot him.

No objection to the question was made before the answer.

Record was then made in chambers outside the presence of the jury. Defense counsel objected to the prosecutor's question based on its alleged violation of defendant's rights under the fifth, sixth and fourteenth amendments of the United States Constitution concerning his right to remain silent when in custody and his right to a fair trial and due process. Defense counsel moved for a mistrial, citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), for the proposition that it is a violation of due process for a prosecutor to impeach a defendant during cross-examination by commenting on the defendant's *post-arrest* silence. The prosecutor thereafter agreed to refrain from questioning Bass about his *post-arrest* silence in compliance with *Doyle*. Defendant's motion for a mistrial was denied.

*Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, involved a factual situation in which the prosecution attempted to impeach that defendant's defense on cross-examination by questioning the defendant about his failure to come forward at the time of arrest and questioning with the exculpatory statements that he made during direct examination at trial. The sole issue before the Court was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611, 96 S.Ct. at 2241, 49 L.Ed.2d at 94. The Court held

that the use of defendant's post-arrest silence in that manner violated due process:

> Silence in the wake of these [*Miranda*] warnings may be nothing more than the arrestee's exercise of these Miranda rights.... Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale*, [422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)], put it very well:
>
>> "[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.... Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case."
>
> We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.

*Doyle,* 426 U.S. at 617–19, 96 S.Ct. at 2244–45, 49 L.Ed.2d at 97–98 (footnotes omitted).

*Doyle* does not control this case, however, because Bass did not exercise his *Miranda* rights and maintain post-arrest silence in reliance on that warning.

> [T]he *Doyle* rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.

*United States v. Crowder,* 719 F.2d 166, 172 (6th Cir.1983).

At trial, defense counsel asked Bass about his post-Miranda warning and post-arrest airplane trip from California to Des Moines while in the custody of Larry Pendarvis, a Des Moines police officer:

> Q. Did you make any reference to [Officer Pendarvis] concerning your involvement in the death of Billy Grimm? A. I told him I didn't do it....

Officer Pendarvis testified that Bass talked to him about the case on the flight to Des Moines, asked Pendarvis what had happened, what the police knew, and chided him that "if he knew so much, what was Billy and him doing in Des Moines?" Pendarvis apparently became annoyed by Bass' incessant talking because he told Bass that he (Pendarvis) no longer wanted to talk about the case.

■ We note that the Court in *Doyle* was concerned with protecting a defendant's post-*Miranda* warning silence. But, where, as here, defendant disregards his right to remain silent and openly and voluntarily engages in conversation about the events leading up to his arrest, including a general denial of his guilt, the concern for preserving the constitutional protections of one who has relied on such protections is no longer present.

■ We, therefore, hold that the prosecutor's question probing Bass' failure to previously tell the police about the story he testified to at trial, implying that prospective purchasers of the stolen jewels and guns may have killed Grimm, did not amount to constitutional error. The court properly overruled defendant's motion for mistrial.

III. *Evidence concerning photo array.* Bass contends he was denied due process and a fair trial as a result of the State's failure to preserve evidence consisting of a

photo array that was shown to Steven Murray, from which the witness on June 12, 1978, identified a person other than defendant as being with the victim on June 11. There was some evidence, however, that no photo of Bass was in this array. In addition, he says the jury should have been given an instruction permitting it to draw an inference adverse to the State as a result of the missing photo array evidence. When shown another photo array on June 16, Murray identified Bass as the person he had seen with Grimm on June 11. Murray testified at trial and, after an in-court identification of defendant, stated Bass checked in with Grimm on June 9 at the Holiday Inn and that he delivered a food order to Bass in room 151 in late afternoon on June 11.

At trial the police officer, who had shown the first array of four photos to Murray on June 12, 1978, could not find them after diligent search. However, he had the names of those persons in the array and did produce photos of three of those men. Included was a photo of the person, Robert Lee Warren, whom Murray had selected on June 12. The photo of Warren was shown to the jury. The officer was not certain these were the exact photos he had shown to Murray on June 12.

The point of Murray's prior identification of a person other than defendant being with Grimm was clearly made to the jury.

Defendant contends the original photos shown to Murray were exculpatory evidence and the State had the duty to preserve and produce them as defendant requested at trial.

The principles we adhere to concerning whether suppression of alleged exculpatory evidence by the State warrants a new trial are based on *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and are stated in *State v. Beeman*, 315 N.W.2d 770, 777–78 (Iowa 1982), and *Fryer v. State*, 325 N.W.2d 400, 407 (Iowa 1982).

■ Under those principles, we conclude defendant was not denied a fair trial. The

photographic array was not the evidence of Murray's misidentification, but was merely demonstrative evidence to illustrate the testimony of witnesses. C. McCormick, *Law of Evidence*, § 212 at 528 (E. Cleary 2d ed. 1972). Those witnesses fully testified that a misidentification was made. Therefore, there was no suppression of evidence. *See State v. Love*, 302 N.W.2d 115, 123 (Iowa 1981).

We also conclude the photographic array was not "material" to the defense because the jury was fully advised that Murray had made a prior misidentification. *See Fryer v. State*, 325 N.W.2d at 407. A photo of the person Murray had previously misidentified as the one with Grimm was ultimately shown to the jury. There was an adequate basis for the jury to weigh and examine Murray's credibility and identification. Therefore, the original photos in the array were not "material" to the defense in the constitutional sense under the above cited authorities. *See also State v. Whitsel*, 339 N.W.2d 149, 156 (Iowa 1983).

No prejudicial harm resulted to defendant from this issue.

■ Under the above reasoning, it also follows that defendant was not entitled to his requested jury instruction involving an inference against the State for failing to produce the exact photos that were shown to Murray on June 12. The evidence was not withheld. Because the requested photos were not relevant and material to the defense, no error occurred from refusing the requested instruction. *State v. Whitsel*, 339 N.W.2d at 155.

IV. *Cumulative effect of other errors.* Bass contends he was denied a fair trial due to the cumulative effect of the prior assignments and two additional matters that arose during trial.

A. The court sustained defendant's relevancy objection when his girlfriend was asked by the prosecutor if defendant would ever get violent when drunk. The prosecutor then asked her if defendant had ever hit her when she was drunk. Defendant's relevancy objection was again sustained, and the jury was admonished to disregard the

questions. Defendant conceded the unanswered questions did not warrant a mistrial. There were no trial court rulings adverse to defendant here.

B. During direct examination before the jury of Richard Webb, a relative of defendant, the prosecutor elicited, without objection by defendant, that Webb had been convicted of a felony two or three times. Then out of the presence of the jury it was shown that he had an armed robbery conviction in 1959 and an escape conviction in 1963 or 1964. The court overruled as untimely defendant's motion to strike the answer Webb had made before the jury on the basis that the robbery conviction was too remote.[1] Defendant does not contend here that the motion was timely. Under later agreement of the parties, a stipulation was read into the record before the jury that Webb had a 1959 felony conviction and none since then. The jury instruction, dealing with impeachment of a witness by proof of a prior felony conviction, stated the instruction did not apply to Richard Webb. No prejudice resulted to defendant in this incident.

Because we conclude that no prejudicial error occurred in connection with these two matters, they and the other claimed errors did not cumulatively deprive defendant of a fair trial. *State v. Taylor,* 336 N.W.2d 721, 728 (Iowa 1983).

V. *Speedy trial issues.* Defendant filed a pretrial motion to dismiss contending the State failed to comply with Iowa Code chapter 821, "Agreement on Detainers Compact," and that he was denied his right to speedy trial as guaranteed by U.S. Const.Amends. VI and XIV. From an adverse trial court ruling, we granted defendant's application for discretionary review. In *State v. Bass,* 320 N.W.2d 824 (Iowa 1982), we rejected defendant's contentions and affirmed the trial court. Defendant then was brought to trial and convicted.

He reasserts those speedy trial contentions in the present appeal.

Through evidence in support of his motion in arrest of judgment after conviction, he asserts additional prejudice due to his alleged inability to locate two witnesses, who may have been near the Holiday Inn, and business records concerning the gas can sold at the Clark service station. In overruling the motion, the court found from the post-trial evidence defendant presented that no prejudice resulted to defendant in those regards. We agree. In addition, our prior statement in *State v. Bass,* 320 N.W.2d at 831, still applies:

> Under the four factor [*Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972)] analysis, ... giving consideration to the fact that defendant is responsible for most of the delay in this case, we find no denial of defendant's constitutional right to a speedy trial.

There is no error on the speedy trial issue.

Because we find no reversible error in any of the assignments raised by defendant, the judgment of conviction is affirmed.

AFFIRMED.

1. This case was tried while Iowa Code section 622.17 (1981), as interpreted by *State v. Martin,* 217 N.W.2d 536, 545–46 (Iowa 1974) (limits impeachment under section 622.17 to those felony

convictions bearing on truthfulness and honesty and that are not too remote in time), was in effect. Iowa R.Evid. 609 was not effective until July 1, 1983.