# IN THE COURT OF APPEALS OF IOWA

No. 19-2130
Filed February 17, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JEFFREY LYNN WINTERS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Kossuth County, Carl J. Petersen, Judge.

A defendant appeals his conviction for murder in the first degree. **AFFIRMED**.

Martha J. Lucey, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester and Douglas D. Hammerand, Assistant Attorneys General, for appellee.

Heard by May, P.J., and Greer and Schumacher, JJ.

**SCHUMACHER, Judge.**

Jeffrey Winters appeals his conviction for murder in the first degree following a jury trial. Winters argues the district court abused its discretion in declining to strike two potential jurors for cause and in overruling his motion for a mistrial following certain questioning by the prosecution implicating his right to remain silent. Winters also asserts the identification evidence is insufficient to support the jury's guilty verdict. Upon our review, we find no abuse of discretion in the district court's refusal to strike the jurors and in denying Winters's motion for a mistrial. The record contains substantial evidence to support the jury's verdict. Accordingly, we affirm.

## I.      Background Facts.

Randy Page was killed on August 27, 2018. At the time of his death, Randy lived with his wife, Linda Page, in Lu Verne—a city of roughly 250 people. He worked in Clarion, which was thirty miles from his home. Winters lived in Livermore, located approximately eight miles from Lu Verne. Typically, Randy left for work at 4:30 a.m. and returned home by 3:30 p.m. On the day of his death, while at work, Randy received a text message from Winters at 1:47 p.m. that read, "I'm gonna swing by after u get home." Randy responded at 2:43 p.m., "On way now. Be there in 45 min." Randy clocked out of work at 2:38 p.m. On his way home, around 3:30 p.m., Randy stopped at David Parsons's house in Lu Verne. Randy and Parsons worked on a truck together for a "little over an hour," and Randy left and continued home. At 4:44 p.m., Parsons texted Randy that Randy

had left his wallet at his house. At 4:45 p.m., City of Lu Verne cameras[1] captured Randy's vehicle heading through the downtown area towards the direction of his home, then two minutes later, the opposite direction towards Parsons's home, and finally, at 4:47 p.m., traveling back through downtown towards his home.[2]

At 4:12 p.m., City of Lu Verne cameras recorded Winters's vehicle, a 2005 silver Ford Explorer SUV, entering the downtown area of Lu Verne and turning towards the Page residence. Just past 4:00 p.m., Rebecca Kramer, who lives across the street from the Page home with her son, Noah, and husband, Mark, saw a man she identified as Winters standing in front of the Page home. Near 4:45 p.m., Mark Kramer and Randy were returning home. As Mark drove down the street, he saw Randy getting out of his vehicle and noticed someone matching Winters's description sitting outside on the Page patio. Clarence Hauf, who lives "kiddy corner" to the Page residence and who was familiar with Winters, saw Randy and Winters sitting in lawn chairs around this time. He heard Randy and Winters arguing, with Randy yelling at Winters. Beth Hinz, who was at her parents' house next door to the Page home, saw a man matching Winters's description sitting on the Page patio using his cellphone. Hinz later heard four or five gunshots. Noah Kramer saw a vehicle he identified as belonging to Winters leave the Page driveway around 5:00 p.m. at a "high rate of speed." Finally, at 4:53 p.m., surveillance cameras record Winters's vehicle coming from the direction of Randy's home, "southbound this time leaving the area."

---

[1] The cameras are maintained by the city and record the main street downtown area of Lu Verne.

[2] We note the time stamp on the video runs seven minutes early from the actual time of recording. The denoted time reflects the actual time of the events.

Linda Page found her husband's body on the floor of their garage shortly before 5:30 p.m. After finding Randy's body, Linda went to her neighbor Clarence Hauf's home and called 911. Deputy Mark McGregor was dispatched to the scene and observed three shell casings, gunshot wounds to the body, and "a lot of blood around the head area." Randy's wallet and cellphone were not found on his body and were never recovered. The Iowa Department of Criminal Investigation (DCI) collected evidence from the scene, including a bullet, four shell casings, and cigarette butts. None of the physical evidence collected at the scene implicated Winters.[3] As law enforcement continued their initial investigation, neighbors congregated around the home. Law enforcement began interviewing those present and canvassing the area. Linda Page overheard Rebecca Kramer describe a man she saw earlier and identified Winters as matching the description. Winters had previously been to the Page home "five or six times" while Linda was there and she knew him by the nickname "Hawk."

Around 8:30 p.m., Winters stopped at Dana Foss's house in Mason City—about sixty miles from Lu Verne. He took Foss and her daughter out for ice cream and left about twenty minutes later. At 9:53 p.m., Winters received a phone call from his friend and President of the Lu Verne Volunteer Fire Department, Michael Crahan. Crahan had heard speculation that Winters may have been involved in a crime. On the phone, Crahan asked Winters "if everything was all right and what was going on." Winters denied being in Lu Verne that day and stated that he did not shoot anyone. At 10:12 p.m., Winters called Foss and asked if he could come

---

[3] No testing was conducted on the bullet and shell casings. DNA testing was conducted on the cigarette butts. Winters was ruled out as a potential donor.

back and spend the night on her couch. Foss agreed. Winters had not stayed at her house overnight on a previous occasion. That evening, law enforcement kept watch over Winters's residence in Livermore; Winters never returned home. Winters returned to Foss's home around 11:00 p.m. He did not bring an overnight bag, his medication, or his dog. Near the same time, DCI Special Agent Chris Callaway attempted to call Winters, but the call went to voicemail. He did not leave a voicemail but texted Winters asking him to "[p]lease call me."

The next morning, around 7:00 a.m., Winters returned the call to Agent Callaway. He told Callaway he had not called the night before because he was having car trouble. Winters asked Callaway "who had gotten shot."[4] Callaway asked Winters where he was and whom he was with, but Winters refused to answer. Callaway asked to speak with Winters in-person, and they agreed to meet at the Clear Lake Police Department at 8:00 a.m. Shortly after their conversation, Winters texted Callaway and requested they meet in Mason City instead. Callaway obliged and told Winters to meet him at the Mason City Police Department. Callaway arrived at the location on time, waited forty minutes, but Winters never appeared. Callaway attempted to reach Winters by phone several times but his calls were all forwarded to voicemail.

Around this time, Winters asked Foss to drive him to the home of her mother, Judy Graham, also in Mason City. Foss agreed and drove Winters in her vehicle to her mother's house. They arrived at Judy's house sometime around 8:00 a.m. Winters asked Judy to call her son, Lee Graham, so he could talk to

---

[4] Details concerning the method of death had not been released to the public.

him. Judy called her son and connected the two. After the call, Winters asked Foss and Judy to drop him off at Lee's house in Mason City. Winters requested that Foss and Judy pick up his dog at his house in Livermore. They agreed and dropped Winters off at Lee's house about ten minutes later.

Earlier that morning, law enforcement executed a search warrant on Winters's home. During the search, officers found Winters's dog and recovered a gun holster and two cell phones. The DCI crime lab determined the holster could accommodate a 9mm handgun—the type of weapon used to kill Randy—without need for adjustment. Law enforcement continued looking for Winters throughout the day and learned through Foss that Winters was at Lee's house.

Around 7:00 p.m., law enforcement went to Lee's house looking for Winters. Lee came to the door but did not let officers inside. When officers asked where Winters was, Lee motioned with his head towards the back of the house and then yelled over his shoulder that the police were there. Soon after, officers heard someone running through the house and saw Winters fleeing out a back door. An officer stationed at the back door, gun drawn, ordered Winters to stop. Winters complied and was taken into custody without further incident. Law enforcement searched Winters and found his cellphone in his back pocket with the battery separated from the device. Officers brought Winters to the Mason City Police Department for questioning. Winters was "extremely vague" about his recent activities but admitted he had been over to Randy's house the day before. On September 3, Foss found a 9mm bullet where Winters had parked his vehicle in her driveway.

On September 7, 2018, Winters was charged by trial information with murder in the first degree in violation of Iowa Code section 707.2(1)(a) and 707.2(2) (2019). On October 22, 2019, a jury trial commenced, and on October 30, the jury returned a guilty verdict. Winters was sentenced to life imprisonment.

Winters appeals his conviction, arguing the district court abused its discretion in declining to strike two potential jurors for cause and in overruling his motion for a mistrial following certain questioning by the prosecution. Winters also asserts the evidence is insufficient to support the jury's guilty verdict. We address his claims in turn.

## II.     Challenge for Cause to Strike Jurors.

During jury selection, all but a few members of the venire indicated they had previously heard or read information about Winters's case. The potential jurors were called separately into chambers for individual voir dire. Among those examined were Jurors No. 3 and No. 49. Winters sought to strike these jurors for cause. *See* Iowa R. Crim. P. 2.18(5)(k) (allowing a party to challenge a prospective juror for cause if the juror has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial"). The challenges were denied. Winters later used peremptory challenges to strike the potential jurors from the jury. *See* Iowa R. Crim. P. 2.18(9) (allocating ten strikes to each party for a class "A" felony). Winters requested the court supplement the peremptory challenges expensed on Jurors No. 3 and 49; however, the district court denied his request.

Winters claims the district court abused its discretion in denying his challenges to strike for cause and the court's refusal to supply additional peremptory challenges requires reversal.

## A.     Standard of Review

We review a district court's ruling on challenges to potential jurors for cause for an abuse of discretion.  *State v. Jonas*, 904 N.W.2d 566, 571 (Iowa 2017); *State v. Tillman*, 514 N.W.2d 105, 107 (Iowa 1994).

## B.     Legal Framework

To overcome the district court's ruling on appeal, Winters must prove that (1) the district court erred in denying his challenge for cause, (2) the denial caused him to expend a peremptory challenge, and (3) he requested an additional supplemental strike that was refused.  *Jonas*, 904 N.W.2d at 570 (adopting a three-prong approach to presumption of prejudice where a defendant requests an additional strike after the court improperly refuses to disqualify a juror, causing him to expend a peremptory challenge); *see also State v. Lindaman*, No. 18-1147, 2020 WL 821974, at *3 (Iowa Ct. App. Feb. 19, 2020) (explaining the *Jonas* framework).

As noted, Winters expended two of his peremptory challenges and the district court denied his request for supplemental strikes, satisfying the second and third prongs of the test.  Therefore, prejudice will be presumed and we need only address whether the district court abused its discretion in denying Winters's challenges for cause.  *See Jonas*, 904 N.W.2d at 583.

### C.    Analysis

To justify reversal, we must find the challenged juror "[held] such a fixed opinion on the merits of the case that he or she [could not] judge impartially the guilt or innocence of the defendant." *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993); *accord State v. Hardin*, 498 N.W.2d 677, 682 (Iowa 1993); *State v. Simmons*, 454 N.W.2d 866, 868 (Iowa 1990). In recognition of the "on the spot and in real time" nature of juror disqualification determinations and the limitations of a cold record, reviewing courts defer to the district court on such rulings and afford broad discretion. *Jonas*, 904 N.W.2d at 574; *see Skilling v. United States,* 561 U.S. 358, 386–87 (2010) ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record . . . . the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.").

An abuse of discretion will often not be found where a juror evidenced a potential bias but upon further examination indicated they would be able to return a fair and impartial verdict. *See Simmons*, 454 N.W.2d at 868 (finding the district court applied the correct standard in dismissing only if the juror expressed "an unqualified opinion [of prejudgment] that will be unshaken by the evidence."); *Hardin*, 498 N.W.2d at 682 (finding reversal unwarranted where the district court refused to excuse a juror who expressed political views opposite to the defendant in a political protest case but did not equivocate in the position that he could fairly consider the evidence).

Quoting the United States Supreme Court with approval, our supreme court has stated,

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*State v. Walters*, 426 N.W.2d 136, 139 (Iowa 1988) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

However, "trial court discretion is not unlimited in allowing or disallowing challenges for cause in criminal cases." *Jonas*, 904 N.W.2d at 574. The Iowa Supreme Court agreed with this court's finding of an abuse of discretion where the district court refused to strike a juror who failed to indicate her opinion of the defendant's guilt would not ultimately influence her views in the case. *Neuendorf*, 509 N.W.2d at 746. In *Neuendorf*, the juror was aware that a codefendant to the case had already been found guilty and believed the defendant in the present case was "probably equally as guilty." *Id.* Upon further inquiry of the juror, she stated that although she would "try to be fair[,] she honestly believed that this would be difficult." *Id.* The supreme court found these statements "substantially" distinguishable from those where "the jurors challenged for cause had affirmatively indicated in response to inquiries made to them that, although they were troubled about what they knew about the case, they would withhold judgment and presume the defendant innocent until the evidence proved otherwise." *Id.* (citing *Simmons*, 454 N.W.2d at 868).

Therefore, a finding of an abuse of discretion often hinges on whether the record reveals a juror's affirmative indication sufficiently dispelling partiality, and generally will not be found where a potential juror unequivocally states their ability to only consider the evidence presented at trial and return a fair and impartial verdict. *See Jonas*, 904 N.W.2d at 573–75 (discussing federal and Iowa case law relating to juror disqualification); *Walters*, 426 N.W.2d at 139.

Both of the potential jurors Winters takes issue with indicated they had prior knowledge of the case. Juror No. 3 remembered details of the crime reported in the local newspaper and on the radio, and Juror No. 49 had learned of Winters's prior criminal history from the radio. Discussion in relation to the issues concerning each juror follows.

a. *Juror No. 3*

When asked by the State what she remembered being reported about the crime, Juror No. 3 stated, "[A] man was shot and bleeding on the floor, and that there was a vehicle matching this man's description leaving town so that's kind of how they placed him." She was asked whether she could separate the information she had learned from the evidence presented in court and "be fair to both sides because [she hasn't] heard any evidence yet." She responded that she could. Defense counsel then examined the juror and asked, "[H]ave you formed an opinion as to [Winters's] guilt or innocence?" and she responded, "Yes." The questioning continued:

> Defense counsel: And is that opinion that you formed based on information that you have brought with you into the courtroom today? A. Yes.

> Q. So even though you haven't heard any evidence in this case, you have already decided whether [Winters] is guilty or not? A. I haven't decided. I have an opinion.
>
> . . . .
>
> Q. What's the opinion that you've formed in this case? A. That by what I have read or heard on the radio or seen on the computer, it—my opinion is who else could it have been that killed this man.

The State continued:

> Prosecutor: I thought you said you could be fair to both sides. A. Because based on what I have read and heard on the radio, that's my opinion, and who else could it be. But I think I could listen to the evidence and not bring those other things in. I hope I can do that.
>
> . . . .
>
> Q. What we want to know is it a fixed opinion where you come in this courtroom, you already go your mind made up? A. No. It is not a fixed opinion.
>
> . . . .
>
> Q. But as you sit here today, do you think you could be fair to both Mr. Winters and to the State and set aside anything you read and decide his case on the evidence presented? A. I will say yes.
>
> Q. Okay. A. Yes.

The court then engaged the juror:

> Court: All right. And maybe what the court would do, you've expressed an opinion, but what I'm hearing is it's not an unqualified opinion. It's a tentative opinion at this point? A. Yes. It's my initial opinion.
>
> Q. And can you lay aside your impression or opinion and render a verdict based upon the evidence presented— A. Yes.
>
> Q. —in court? A. Yes.

Winters challenged Juror No. 3 for cause, arguing she had formed an opinion of Winters's guilt. The district court rejected the challenge, reasoning "that this juror is identifying she can set aside her opinion."

We find no abuse of discretion in the district court's denial of Winters's challenge. "The mere fact that a juror has read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror." *Finnegan v. United States*, 204 F.2d 105, 110 (8th Cir. 1953), *cert. denied*, 346 U.S. 821 (1953).

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*State v. Sallis*, 262 N.W.2d 240, 246 (Iowa 1978) (discussing *Rizzo v. United States*, 304 F.2d 810, 815 (8th Cir. 1962)).

Here the record reveals that Juror No. 3 affirmatively indicated her ability to return a fair and impartial verdict. She stated that despite having an initial opinion about the case, it was not a fixed opinion and she would be able to lay this opinion aside and render a verdict based upon the evidence presented at trial. We find these statements sufficient to find there was not an abuse of discretion by the district court.

        b.     *Juror No. 49*

After stating that he had heard about the crime on the radio, Juror No. 49 was asked by the State if he would be able to separate the information he had heard from outside the courtroom and the evidence presented at trial. He responded, "Yeah. I think I could, yeah." He was asked whether he could be fair to both sides, and he responded that he could. He was asked whether he had formed any opinions about the case, and he responded, "No, I haven't." Defense counsel then questioned the juror and asked what he specifically remembered about Winters. Juror No. 49 responded:

> Yeah. Just that [Winters] had previously been arrested for aggressive or violent things and then had been released, and so I think it was just a shock to the community, my friends, and my girlfriend that that—it was almost like it was allowed to occur because—um, because of the rerelease.

Q. Okay. And is that kind of a perspective that you share? A. Um, I mean, a shock, in general, I guess, yeah. It was—yeah. It's definitely the opinion I had in August when I originally heard about it.

The State was given an opportunity to further question the juror:

Prosecutor: And [Juror No. 49], if there's no evidence about any previous incidents or anything, if it's—if there is—a focus is on the evidence in this case, that's what we're trying to find out is can you set aside other things you may have heard or read and decide the case on the evidence presented and not other things that may have been reported? A. Yes, yeah.

Winters challenged Juror No. 49 for cause arguing the juror possessed knowledge which constituted prior bad acts evidence subject to exclusion under his motion in limine. The district court denied the challenge, again citing that the juror indicated an ability to only consider the evidence presented and return a fair verdict.

On appeal, Winters advances a similar argument heard by the district court. Specifically, Winters contends that the statements Juror No. 49 was exposed to "are hearsay and hearsay within hearsay of indeterminate multiple levels . . . not admissible under any exception to the hearsay rule" constituting inadmissible character evidence. *See* Iowa Rs. Evid. 5.404(b) (rule against prior bad acts evidence), 5.803, 5.804, 5.805 (hearsay rules and exceptions). Winters argues that because the rules of evidence may preclude introduction of the statements and information Juror No. 49 had been exposed to, the juror himself must also be excluded from serving on the jury.

We find this argument unpersuasive. The juror's exposure to information potentially inadmissible by the rules of evidence at trial does not by itself prohibit him from serving as a juror. See *State v. Royer*, No. 15-0895, 2016 WL 6652339,

at *1–2 (Iowa Ct. App. Nov. 9, 2016) (expressing doubt that lower court abused its discretion in refusing to grant challenge for cause where "several members of the venire admitted knowledge of [defendant] and his criminal record from news articles they had read about the crime"). "[T]he relevant question is not what a juror has been exposed to, but whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant." *Walters*, 426 N.W.2d at 138.

Here while Juror No. 49 had some prior knowledge of Winters's past, he stated unequivocally he had not formed an opinion of the case. He was unwavering in his belief he could separate what he had previously heard and the evidence presented at trial and he could return a fair verdict. We do not find Juror No. 49 indicated such a fixed opinion and an inability to render an impartial verdict that the district abused its discretion in refusing to dismiss him.[5]

---

[5] We also note the seating of Winters's designated objectionable juror may not have been outside of Winters's control. *See Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006) (finding no prejudice where the city could not demonstrate the district court's error forced the city to leave an objectionable juror on the jury). The State, while indicating they believed there was no error regarding the district court's declination to strike Juror No. 49, offered a compromise to put "[Winters] in the same position they were yesterday when [Winters] made the motion to the court for a preemptory challenge." Rather than designating the last two jurors called as the two alternates, the State offered an option allowing Winters to avoid a juror he would have struck with a peremptory strike.

The State offered:

So to avoid—in an abundance of caution to avoid any issue the state had proposed to defense counsel this morning that we could—they indicated yesterday they—if they would receive the two additional preemptory strikes they had two jurors that they wanted to strike. The State offered to let them strike one of those two people and then not have a second alternate, or make the person they want to strike the second alternate. In other words, giving them what they wanted for the one juror, [Juror No. 49].

Assuring our conclusion are the instructions received by the jury and our presumption the jury followed them. *See State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010) ("We presume juries follow the court's instructions."); *State v. Anderson*, 228 N.W. 353, 356 (1929). Jury instruction No. 12 instructed the jury to base its "verdict only upon the evidence and these instructions." It provides for what is and what is not evidence. In defining what is not evidence, the instruction states specifically, "Anything you saw or heard about this case outside the courtroom." Nothing in the record indicates the jury did not follow the instructions or relied on an improper basis during their deliberations. See *Sallis*, 162 N.W.2d at 246–47 (Iowa 1978) (finding "bare assertion" that publicity surrounding case tainted jury insufficient to show defendant was denied a fair trial because "[w]here there is no showing that any of the jurors violated the admonition of the Court not to read newspaper accounts of the trial, it is not to be assumed that as a matter of human nature they did violate the admonition" (quoting *Rizzo*, 204 F.2d at 817).

## III.     Prosecutorial Misconduct—Motion for a Mistrial.

Winters argues the district court erred in overruling his motion for a mistrial following testimony allegedly implicating his right against self-incrimination. *See* U.S. Const. amends. V, VI, XIV (ensuring a criminal defendant, among other things, the right to remain silent during post-arrest interrogation); Iowa Const. art. 1, § 9 (affording similar protections under Iowa Constitution). During the State's questioning of Agent Callaway, the prosecutor asked, "Did [Winters] ask why he was being charged?" Callaway responded, "No." Winters objected to the question as implicating a topic subject to exclusion under his motion in limine and as an improper comment on a defendant's right to remain silent. The district court

sustained the objection and admonished the jury that "the answer is struck from the record, and you are directed to not consider that." At the conclusion of the State's direct examination, Winters moved for a mistrial based on the improper question and response. The district judge heard brief arguments from the parties and denied the motion.

### A.     Standard of Review.

We review a district court's denial of a mistrial for an abuse of discretion. *State v. Chadwick*, 328 N.W.2d 913, 916 (Iowa 1983); *State v. Williams*, 315 N.W.2d 45, 55 (Iowa 1982). "When assessing a district court's decision for abuse of discretion, we only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). "Grounds or reasons are untenable if they are 'based on an erroneous application of the law or not supported by substantial evidence.'" *Id.* (citations omitted).

### B.     Analysis

Our supreme court has interpreted United States Supreme Court precedent of the self-incrimination clause of the Fifth Amendment of the United States Constitution to "prohibit the prosecution from using, directly or indirectly, silence of an accused." *State v. Taylor*, 336 N.W.2d 721, 727 (Iowa 1983); *see also Griffin v. California*, 380 U.S. 609, 612–15 (1965) (holding that prosecution's comment on defendant's failure to testify violates the self-incrimination clause); *State v. Nelson*, 234 N.W.2d 368, 371–73 (Iowa 1975) (summarizing the Iowa Supreme Court's application of the *Griffin* standard). However, "[a] showing of prosecutorial misconduct alone will not warrant a new trial." *State v. Bishop*, 387 N.W.2d 554,

561 (Iowa 1986). To justify reversal, Winters must prove (1) "the prosecutor's conduct or remarks were improper," and (2) "this misconduct prejudiced [his] substantial rights causing [him] to be deprived of a fair trial." *Id.* at 563 (citing *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir. 1985)).

a.  *Propriety of Prosecutor's Statements*

A prosecutor's conduct or remarks will be found improper if "(1) the prosecutor manifestly intended to refer to the defendant's silence, or (2) the jury would naturally and necessarily interpret the statement to be a reference to the defendant's silence." *State v. Hutchison*, 341 N.W.2d 33, 39 (Iowa 1982) (internal quotation marks and citation omitted). In their briefings, the parties dispute whether the prosecutor's question was improper. Winters relies on *Doyle v. Ohio*, in which the Supreme Court held a prosecutor's use of a defendant's silence for impeachment purposes violated a defendant's right to a fair trial. 426 U.S. 610, 617−19 (1976). The State points to an Iowa Supreme Court decision, *State v. Bass*, where the court found "the concern for preserving the constitutional protections . . . no longer present" for a defendant who does not rely on such protections and waives their right to remain silent. 349 N.W.2d 498, 503 (Iowa 1984).

To decide the present case, we find it unnecessary to determine whether the prosecutor's statements were improper. *Cf. State v. Graves*, 668 N.W.2d 860, 869 ("[I]t is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial." (citation omitted)). The district court sustained Winters's objection. Adopting the district court's conclusion and assuming on

appeal the testimony was improper, Winters's claim is resolved under the prejudice prong.

> b. *Prejudice*

"The party claiming prejudice bears the burden of establishing it." *State v. Anderson*, 448 N.W.2d 32, 33 (Iowa 1989). When ruling on a motion for a mistrial, the district court "has broad discretion to determine whether defendant has suffered such prejudice." *Bishop*, 387 N.W.2d at 561. As a reviewing court, we afford such deference "because the trial court is a firsthand observer of both the alleged misconduct and any jury reaction to it." *Anderson*, 448 N.W.2d at 34.

In moving for a mistrial, Winters argued the cautionary statement given by the court was insufficient to mitigate the prejudicial evidence. The district court denied the motion, stating,

> Generally the striking of an improper response and instruction to the jury to disregard the response will prevent prejudice. Having considered the alleged improper question and the possible effect on the jury's ability to return an impartial verdict, I find the events described do not rise to the level of a proper granting of a motion for mistrial . . . .

We find the district court's reasoning sound. Any prejudice that resulted from the alleged misconduct was sufficiently mitigated as to not require a mistrial by the district court sustaining Winters's objection, striking the question and answer, and instructing the jury to disregard the testimony. "Generally, an improper statement is not unduly prejudicial when trial court admonishes the jury to disregard it." *Bishop*, 387 N.W.2d at 561 (citing *Williams*, 315 N.W.2d at 55–56). "Cautionary instructions are sufficient to mitigate the prejudicial impact of inadmissible evidence 'in all but the most extreme cases.'" *Id.* (quoting *State v.*

*Breitbach*, 488 N.W.2d 444, 448 (Iowa 1992)). "Generally, a district court's decision not to grant a mistrial but to offer a cautionary instruction instead is entitled to broad deference." *Plain*, 898 N.W.2d at 811.

We find no abuse of discretion in the district court's denial of Winters's motion for a mistrial.

## IV.     Sufficiency of the Evidence.

Winters contends the district court erred in overruling his motion for judgment of acquittal as the evidence of identity presented at trial was insufficient for the jury to find him guilty.

### A.     Standard of Review

Sufficiency of evidence claims are reviewed for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). A verdict is binding upon this court and will be upheld unless it is not supported by substantial evidence. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). Substantial evidence is evidence that would convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.* If evidence raises only suspicion, speculation, or conjecture, it is not substantial. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We consider all evidence in the record, not just the evidence supporting guilt. *Tipton*, 897 N.W.2d at 692. We view all relevant evidence in the light most favorable to the State. *Id.*

### B.     Discussion

Winters argues that various inconsistencies among witness testimony and the circumstantial nature of the evidence produced through police investigation require this court to overturn the jury's verdict. However, witness credibility and

the weighing of evidence is uniquely reserved to the jury's purview. It is not our role "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005) (quoting 75A Am. Jur. 2d Trial § 1026, at 573–74)); *see also State v. Laffey*, 600 N.W.2d 57, 59 (Iowa 1999) ("[I]t is for the jury to judge the credibility of the witnesses and weigh the evidence." (citation omitted.)). We confine our analysis to the record and whether it contains substantial evidence which "could convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Bayles*, 551 N.W.2d 600, 608 (Iowa 1996).

Winters argues the State failed to sufficiently prove the necessary identity element of murder in the first degree because of various inconsistencies among witness descriptions of the man seen outside the Page home. *See* Iowa Code § 707.2(1) (outlining the elements of murder in the first degree). Many of the Page neighbors testified to their observations of the Page residence in the hours before Randy's death. These witnesses reported seeing a man generally matching the description of Winters and a vehicle generally matching the description of his vehicle. Along with their eyewitness testimony, Clarence Hauf and Rebecca Kramer positively identified Winters in court and Noah Kramer identified Winters's vehicle. The witness testimony tends to prove the identity of Randy's killer and suggests it was Winters who was with Randy shortly before his death. This evidence is corroborated by the text message Winters sent to Randy, video surveillance footage, and the fact that Winters himself admitted to Agent Callaway that he was with Randy on the evening of his death.

Inconsistencies among the witness testimony does not preclude the jury from finding Winters guilty. *See Williams*, 695 N.W.2d at 28 (explaining the fact-finding role of the jury).

> [T]he jury is at liberty to believe or disbelieve the testimony of witnesses as it chooses and give such weight to the evidence as in its judgment the evidence was entitled to receive. The very function of the jury is to sort out the evidence presented and place credibility where it belongs.

*State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984) (citations omitted). "'Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Nitcher,* 720 N.W.2d 547, 556 (Iowa 2006)). "Any inconsistencies in the testimony of a . . . witness are for the jury's consideration, and do not justify a court's usurpation of the fact-finding function of the jury." *Williams*, 695 N.W.2d at 28 (emphasis omitted) (citation omitted).

Similarly, the lack of direct physical evidence implicating Winters does not foreclose a guilty verdict. *See State v. Schurman*, 205 N.W.2d 732, 733–34 (Iowa 1973) (outlining the required standard of proof to sustain a jury verdict on a sufficiency of the evidence claim). Ample circumstantial evidence implicating Winters in the crime and suggesting his guilt was presented at trial. "Direct and circumstantial evidence are equally probative." Iowa R. App. P. 6.904(3)(p); *State v. Kittelson*, 164 N.W.2d 157, 162 (Iowa 1969) ("Circumstantial evidence may be equal in value to, and sometimes more reliable than, direct evidence."). Winters was with Randy on the evening of his death. Video surveillance footage shows his vehicle leaving the area of the Page residence roughly one half-hour before

Randy's body was discovered. On the night of Randy's death, Winters never returned home and stayed over at Dana Foss's house—something he had never done before. He did not bring an overnight bag or make overnight accommodations for his dog. Winters was untruthful to his friend Michael Crahan and denied being in Lu Verne on the day in question. He was not forthcoming with law enforcement and did not show up to the interview he scheduled with Agent Callaway. Investigators recovered a holster from Winters's home that could accommodate a 9mm handgun without adjustment. When law enforcement arrived at Lee Graham's house, Winters fled out the backdoor. After being apprehended, a search of Winters revealed he had separated the battery from his cellphone device. A 9mm bullet was found where Winters's vehicle had been previously parked in Foss's driveway.

Winters contends this evidence is insufficient and posits, "do the acts of being seen at the crime scene within a given, approximate time, leaving town and trying to avoid the police constitute proof beyond a reasonable doubt?" In this case, we believe a rational jury may so find.

> While mere presence of a person at the time and place of a homicide is not sufficient evidence alone to establish that person's participation in a murder, it is circumstantial evidence that may be considered, and which may, under the surrounding facts and circumstances in a given case, be entitled to great weight.

State v. Bass, 349 N.W.2d 498, 501 (Iowa 1984) (citing State v. Schrier, 300 N.W.2d 305, 309 (Iowa 1981)). "We have recognized that an individual's flight from the scene of a crime is a circumstance from which a jury may find the defendant departed because of his consciousness of guilt." Id. at 502 (citing State v. Webb, 309 N.W.2d 404, 409 (Iowa 1981)). "[T]he underlying reason for fleeing,

and the inferences to be derived therefrom, are factual issues for the jury to determine." *Id.* (citing *State v. Blair*, 347 N.W.2d 416, 422 (Iowa 1984).

It is the jury's role, not ours, to resolve any inconsistencies in witness testimony and to weigh the evidence presented. *See State v. Mitchell*, 568 N.W.2d 493, 504 (Iowa 1997); *State v. Knox*, 536 N.W.2d 735, 743 (Iowa 1995). Viewing the evidence in the light most favorable to the State, we find the record contains substantial evidence to support the jury's verdict. Consequently, we find no error in the district court's denial of Winters's motion for a judgment of acquittal.

**V.     Conclusion**.

Upon our review, we find no abuse of discretion in the district court's refusal to strike two potential jurors for cause or in denying Winters's motion for a mistrial. The record contains substantial evidence to support the jury's verdict. Accordingly, we affirm Winters's conviction.

**AFFIRMED.**